THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT E. LEE, Defendant-Appellant.

First District (5th Division) Nos. 85—754, 85—3224 cons.

Opinion filed December 19, 1986.

Eugene R. Wedoff and Daniel R. Warren, both of Jenner & Block, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, Susan Davis Brunner, and Robert M. Podlasek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

This case involves a consolidated appeal by defendant Robert Lee from convictions resulting from two separate trials. In the first case (Lee I), after a jury trial, defendant was convicted of the murder and attempted armed robbery of William Hawbecker and was sentenced to a term of imprisonment for natural life. In the second case (Lee II), defendant was convicted after a bench trial of the attempted murder and armed robbery of Peter Larson and was sentenced to 20 years' imprisonment, to run concurrently with the life sentence. The same trial judge presided over both trials. By stipulation of the parties, the evidence in the Lee II trial consisted solely of excerpts from the transcript of the Lee I trial. The two appeals were consolidated since they contain common issues.

The charges against defendant arose out of three separate shootings in Chicago's Uptown area on the evening of January 26, 1984. On that date, Hawbecker was treated for a gunshot wound by Dr. Cathleen Cline at Illinois Masonic Hospital. Hawbecker told the doctor that he had been beat up in the head area and then shot by two men as he was walking down the street sometime between 7 and 7:15 p.m. Hawbecker had walked home and was taken to the hospital by a friend. After talking to Dr. Cline, Hawbecker was interviewed by Chicago police officers James Allota and Nick Cesario. He told the officers that he had been shot near 3400 North Lakewood Street by a white male, 16 to 18 years old, who was approximately 5 feet 8 inches, with long blond hair and was wearing dark clothes. His assailant fled after the shooting; no robbery took place. The officers then transmitted the description of Hawbecker's assailant, excluding any reference to his clothing, over their police radio.

At 8:15 p.m. Officers Alex Horstein and Donald Eichler sepa-

rately responded to a "man with a gun" call near 4200 North Kenmore Street, approximately one mile away from the location of the Hawbecker shooting. At the scene, an unidentified man told Officer Eichler that a young blond kid, approximately 18 to 25 years old, had displayed a handgun and caused a commotion. Officer Horstein testified that he heard at least one, and maybe 15 to 20, unidentified bystanders state that Robert Lee was the person with the gun. The officers then left the scene and drove through the area looking for the described person. Both officers stated that they had known defendant for several years prior to this incident and that they were both aware of past complaints of defendant shooting out streetlights on Kenmore. Horstein further testified that he remembered that complainants had said defendant was shooting the streetlights with a chrome-plated gun that "sounded like a .22." Also, both officers had heard the earlier description of Hawbecker's assailant over their police radios.

At 9:15 p.m. Officer Eichler saw defendant walking near Belmont and Clark Streets, which is approximately 1½ miles from the "man with a gun" location and one-half mile from the area where Hawbecker was shot. Based on the "man with a gun" description, he stopped defendant, asked for identification, and patted him down, looking for a gun. No weapon was found, and defendant was released. Officer Eichler then transmitted the details of the stop over his radio and included defendant's name and address in the radio description. Officer Horstein heard this report on his radio and, at 9:30 p.m., saw defendant walking near Clark and Cornelia streets but was unable to stop because of traffic. Horstein testified that he recognized defendant because the officer frequently visited a friend who lived in the same building as defendant's mother. Horstein testified that he had seen defendant in that building approximately 30 times during the past six years. Shortly after this 9:30 sighting of defendant, Officers Horstein and Eichler met with other tactical officers and discussed information concerning defendant.

Around 11 p.m., Officer Allotta received a radio call that a man had been shot in an alley off of 1061 West Cornelia, which is a few blocks from the Hawbecker scene and is four blocks from where Officer Horstein had seen defendant at 9:30 p.m. Allotta, who had interviewed Hawbecker in the hospital, responded to this call and spoke briefly with the victim, Peter Larson. Allota then interviewed Deborah Jones, who had witnessed the two assailants leaving the scene. Jones told the officer that two people were involved: a male, white Hispanic and white male who was 19 years old, very slender, and had long blond hair. This information was transmitted over the

police radio, whereupon Officer Eichler radioed back that he had stopped defendant a short time before the Larson shooting. Eichler's radio message also stated that the description of one of the Larson assailants matched that of defendant and was also the same description as the Hawbecker shooter and the "man with a gun" report. Eichler also transmitted defendant's name, birthdate, and address. Upon hearing Allotta's message, Officer Horstein continued looking for defendant. Horstein stated that he believed defendant's address to be on Kenmore, where defendant lived during the complaints regarding the shooting of streetlights.

Larson, a cab driver, testified that he picked up two young men around 11 p.m. One of the men was a Puerto Rican and the other, whom he had a good view of under the cab's interior dome light, was white, about 18 years old, between 5 feet 10 inches and 6 feet tall with blond, shoulder-length hair that was pushed up by the man's coat collar. Larson could not recall any specific facial characteristics, including whether the white male had unusual eyes. Defendant has crossed eyes. Larson also could not describe the assailant's clothing. Upon arriving at their destination, the white male pointed a gun at Larson, announced "This is a stickup," and ordered Larson to drive into a nearby alley. The white male asked Larson for money. Larson took money out of his pocket and gave it to the Puerto Rican, who then left the cab. The white male then demanded Larson's wallet and afterwards shot him twice in the back of the head.

Around midnight, Paula Tomas was shot as she sat with a friend in front of her home on West Fletcher Street, approximately one mile from the location of the Larson shooting. Tomas did not see who shot her since there was no one else on the streets at that time. Her friend testified that a light blue car sped by and that he heard a shot and discovered Tomas had been hurt.

After these incidents on January 26, Officers Horstein and Eichler both stated that they continued to search for defendant until their shifts ended. Eichler waited outside defendant's West Buena Place address but did not knock on the door. Horstein testified that he continued to look for defendant for the next three days but that he never went to the building where he knew defendant's mother lived. Around 10 a.m., on January 30, Horstein saw defendant on the street, about four blocks from his home, and made a warrantless arrest for the January 26 shootings.

On the same day as defendant's arrest, Detective Stachula took eight photographs, including defendant's pictures, to Larson, who was in the hospital. Larson at that time told Stachula that his eyes were

blurry and his frontal vision was affected by recent surgery. Larson stated that he could not identify any facial features and did not want to identify his assailant unless he could be positive.

The next day, January 31, defendant was questioned at the police station by Detective Stachula and Assistant State's Attorney Thomas Epach. Both men were familiar with the police reports concerning the shooting incidents. The police had no information concerning the Hispanic man involved in the Larson shooting, nor had the gun been recovered. Defendant was questioned for over an hour. Initially, he claimed a person who looked just like him shot the three victims and that he observed these events. After Stachula called defendant's mother and learned that defendant was in and out of their apartment that evening, defendant allegedly confessed to the shootings. (Later, at trial, defendant's mother testified that her son was in the apartment all evening except briefly around 10 p.m. A family friend similarly testified.)

Since defendant could not read or write very well, Epach wrote the three-page confession. Epach testified that as he asked a question of defendant, he would then write the answer down, changing only a few words. After the confession was completed, Epach then read the entire document to defendant after which defendant signed his name on each page. In his confession, defendant stated that he was a drug addict, that he needed money for drugs, and that he took his silver .22-caliber gun and went out looking for people to rob. He said that he tried to "stick up" Hawbecker on Lakewood, but that as Hawbecker began to reach into his pockets, he shot him. Defendant also stated that prior to the shooting, he had hit Hawbecker in the face several times. Defendant then went home and listened to music until approximately 11 p.m. when he went out and met up with a man whose name he did not know. Both men then proceeded to hail a blue and white cab and subsequently robbed Larson in an alley off Lakewood. As to the Tomas shooting, defendant stated that he walked up to the woman and demanded her money. When she became excited, defendant shot her. Defendant did not remember where he put his gun after the shootings nor did he know the name of his Hispanic accomplice.

Afterwards, Detective Stachula took defendant, who was handcuffed, to see Larson in the hospital. Stachula entered the room first and told Larson that he had a person who had confessed to the shooting. Stachula stated that defendant apologized to Larson, although he had not told him to do so. Larson then identified defendant as his assailant and later identified him at trial even though defendant's hair

was shorter and was no longer blond. Stachula further stated that he then took defendant to Tomas' hospital room. Tomas did not identify defendant because she had not see who shot her. She also stated that no one had tried to rob her. She further testified that Stachula "made the kid apologize" to her.

On February 13, 18 days after he was shot, Hawbecker was found dead in his apartment. Dr. Robert Kirschnerr of the Cook County medical examiner's office performed an autopsy and determined that Hawbecker died as a result of an acute subdural hemorrhage which was caused by the gunshot wound to his head. Dr. Frank Marmo, a fifth-year neurosurgery resident who treated Hawbecker, was of the opinion that the gunshot wound did not cause Hawbecker's death.

Dr. Jack Arbit, a psychologist, testified as an expert witness for the defense concerning his examination of defendant. Dr. Arbitt tested defendant in June 1984. He determined that defendant was functionally illiterate and that he was essentially mentally defective, functioning in society less well than 98 out of 100 people. Dr. Arbit also testified that defendant's memory was his poorest ability and that he was prone to confabulation, *i.e.,* "an individual's attempt to fill in the memory gaps when they are aware they should know what is missing, but cannot remember it." The State cross-examined Dr. Arbit on this point, noting that he assigned to defendant an overall I.Q. level of 68, which is considered mildly retarded by a well-known clinical book.

After defendant was found guilty in Lee I (the Hawbecker case), the trial court sentenced him to natural-life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)) on the basis that Hawbecker was shot during the commission of another felony, attempted armed robbery.

On appeal, defendant raises nine issues. In both Lee I and Lee II, defendant contends that (1) the police lacked probable cause to arrest him; (2) the trial court erred in failing to suppress Larson's in-court and pretrial identification, even though the latter was grossly suggestive; and (3) the trial court improperly limited defendant's right to cross-examination and to present evidence on his behalf. In Lee I (the Hawbecker case), defendant additionally claims that (4) permitting the prosecution to introduce evidence of other crimes was error; (5) it was error to allow hearsay evidence concerning the offender's description and identification; (6) he was denied a fair trial by the prosecution's comments directing the jury's attention to his failure to testify and in arguing to the jury that he would commit violent crimes in the future,

as well as other prosecutorial misconduct; (7) the trial court erred in refusing to give a jury instruction relating to a major defense theory; (8) the evidence was insufficient to support an attempted armed-robbery conviction; and (9) the trial court erred in its *voir dire* of potential jurors as to the death penalty.

# I

Defendant contends that there was not probable cause for his warrantless arrest as he was walking down the street four days after the shootings. We disagree.

■ The existence of probable cause is a mixed question of law and fact based on a commonsense view of the totality of the circumstances. (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92.) A person may be arrested without a warrant when a police officer has reasonable grounds for believing that person has or is committing a crime. (*People v. Wright* (1985), 111 Ill. 2d 128, 145, 490 N.E.2d 640.) A mere suspicion by the officer is insufficient; however, evidence sufficient to convict is not necessary. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 166, 445 N.E.2d 766.) Furthermore, since arrests may serve an investigative purpose, they are not limited to situations where the facts indicate that it is more probable than not that the suspect has committed the crime. (*People v. Lippert* (1982), 89 Ill. 2d 171, 179, 432 N.E.2d 605, citing 1 W. LaFave, Search & Seizure sec. 3.2, at 478-85 (1978).) Probable cause for a warrantless arrest depends on the totality of the circumstances and facts known to the officer when the arrest is made; if a reasonable and prudent person in possession of knowledge known to the officer would believe that the person to be arrested had committed a crime, probable cause exists. (*People v. Krogh* (1984), 123 Ill. App. 3d 220, 223, 462 N.E.2d 790.) An officer may rely on his knowledge and experience to draw reasonable inferences from the observed facts, and information possessed by all officers working in concert is relevant. 123 Ill. App. 3d 220, 223-24, 462 N.E.2d 790.

■ Here, the arresting officer knew that the description of the person who shot Hawbecker and Larson matched and, furthermore, that the description fit defendant's appearance. The officer also knew that defendant had been seen flashing a gun by 15 to 20 people in the general area of the shootings within the relevant time frame. Moreover, it was known by the arresting officer that defendant had been seen shooting out streetlights at the same location over a period of the last several years with a chrome-plated gun. These facts, coupled

with Officer Horstein's knowledge of the area and his opinion that long-haired blond men were not common in Uptown in 1983, legitimately gave rise to a reasonable inference that defendant and the shooter were the same person. The hearsay statements of several bystanders at the "man with a gun" scene are permissible facts which the officer could use to establish probable cause. Information received from a private citizen or victim may be relied upon without independent verification of the citizen's or victim's reliability for purposes of probable cause. *People v. Sain* (1984), 122 Ill. App. 3d 646, 651, 461 N.E.2d 1043.

When the foregoing circumstances, combined with Officer Horstein's knowledge and experience, are viewed *in toto,* it is apparent that there was probable cause to arrest defendant.

## II

■ Defendant contends that the trial court erred in admitting evidence relating to the Larson shooting and the man-with-a-gun report in the trial involving the Hawbecker murder. Defendant argues that the other-crimes evidence was prejudicial and irrelevant to any issue in the Hawbecker trial. The Larson evidence was not such as to show identity, *modus operandi,* or a common design or scheme. The man-with-a-gun evidence was also irrelevant to the Hawbecker shooting since allegedly it did not competently establish defendant as the man with a gun.

On the other hand, the State claims that the other-crimes evidence was admissible as being relevant and probative of defendant's guilt. The Larson shooting was relevant in that it placed defendant in proximity to the time and place of the Hawbecker shooting—the two shootings occurring approximately 3½ blocks apart and within 3 hours, 45 minutes of each other. Moreover, the State contends that the descriptions of the assailants in the two shootings were similar and that these descriptions constituted the only evidence as to the identity of the Hawbecker shooter. Additionally, Larson's testimony was relevant to rebut defendant's alibi that he was at home all evening except for a short period between 10 and 10:30 p.m., and the evidence also operated to place a gun in defendant's hands on that evening. Lastly, the State claims that the two shootings bear a threshold resemblance to each other. The State also notes that the man-with-a-gun-report evidence was elicited by defense counsel from Officer Eichler on direct examination, thus opening the door to further questioning on the subject by the State. The trial court allowed the other-crimes evidence on the grounds that it showed a similarity of

weapons, location, and identification between the two shootings.

Initially, we recognize that evidence of other crimes is admissible if it is relevant for any purpose other than to show defendant's bad character or propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821; *People v. Cole* (1963), 29 Ill. 2d 501, 503, 194 N.E.2d 269.) Such evidence is proper to show motive, *modus operandi,* knowledge, identity, absence of mistake, criminal intent, defendant's state of mind, or the circumstances of his arrest, or a common design or scheme. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292.) It is also relevant in placing a defendant in proximity to the time and place of the offense or to rebut a defense alibi. (*People v. Diaz* (1979), 78 Ill. App. 3d 277, 280, 397 N.E.2d 148.) In fact, other-crimes evidence has been held admissible if it is relevant for any purpose other than to show defendant's propensity to commit crime. *People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.

A close reading of the above-cited cases suggests that Illinois has adopted a broad standard for determining the admissibility of other-crimes evidence, *i.e.,* it is admissible if it is relevant for any purpose other than to show defendant's propensity to commit crime. (See generally 73 Ill. B.J. 344 (1985) (asserts that Illinois courts have found a logical connection between crimes on the basis of the continuity of a defendant's mental state and that similarity between the crimes is not required if relevancy exists).) In fact, it has been inferred that the real and sole test of admissibility is independent relevance. (*People v. Allen* (1971), 1 Ill. App. 3d 197, 201, 272 N.E.2d 296.) Relevant evidence is evidence which tends to make the existence of any fact material to the issue more or less probable. *People v. Reed* (1982), 108 Ill. App. 3d 984, 989, 439 N.E.2d 1277.

■ Applying the standard of relevancy to the present case, we first note that time and place proximity, without more, is an insufficient basis for admission of other-crimes evidence. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 139, 402 N.E.2d 238.) However, there are other relevant facts in this case which support admission of the other-crimes evidence. Defendant argues that the State must make a strong and persuasive showing of similarity between the Hawbecker and Larson shootings and that this burden was not met because Hawbecker was accosted on the street by one man, while Larson was shot and robbed by two men who rode in his cab. However, it has never been held that other crimes must be identical to the charged offense before such evidence is admissible; there will always be dissimilarities between independent crimes. *People v. Taylor* (1984), 101 Ill. 2d 508,

521, 463 N.E.2d 705.

In the case at bar, the two shootings bear several similarities. They occurred within several blocks and four hours of each other; both involved a small caliber gun—ballistics reports identified part of a bullet removed from Larson as coming from a .22-caliber gun, and Hawbecker told an emergency-room doctor, Dr. Cline, that he had been shot "with a small gun that didn't make any noise"; both victims were shot in the head for no reason while cooperating with the assailant; and both descriptions of the assailant were nearly identical. Therefore, Larson's identification of defendant placed a gun in defendant's hand in the general vicinity and time frame of the shootings. See *People v. Adams* (1985), 109 Ill. 2d 102, 121-22, 485 N.E.2d 339.

Officer Eichler's testimony regarding the man-with-a-gun report is also admissible. The testimony was first elicited when the defense called Eichler as its witness and on direct examination, asked, "What was your next action after seeing Bobby Lee at Belmont and Clark?" Eichler answered, "Based on the man with a gun call, I created a stop on him, sir." Thereafter, Eichler was extensively questioned as to the description of defendant's clothing at the time of the stop and as to the fact that no weapon was found on him during the search. On cross-examination, the State questioned Eichler as to the time frame of all the events testified to on direct. Eichler was then asked what he did when he responded to the man-with-a-gun call. Eichler said that he went to the scene, obtained a description from a bystander and based on that description, later stopped defendant. Eichler did not testify to the details of the description. On redirect, defense counsel again questioned Eichler about the man-with-a-gun call.

■ Generally, both cross-examination and redirect examination are limited to the scope of the preceding examination and the scope of such further cross-examination is largely within the discretion of the trial court. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 469, 368 N.E.2d 689.) After examining the record, it is clear that defense counsel should have expected Eichler's response. In fact, before answering the question, the officer said that he did not understand it and defense counsel repeated, "What was your next action after seeing Bobby Lee at Belmont and Clark?" From the time of questioning, it is obvious that counsel wanted Eichler to testify to the stopping and searching of defendant. Whether the fact that the stop was based on the man-with-a-gun report was elicited on direct, as here, or on cross-examination, such evidence is relevant to show why Eichler stopped defendant. The door was opened for the State to inquire further into

the matter. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 538, 464 N.E.2d 659.) Although Eichler stated on cross-examination that he based the stop on a description received from bystanders, he did not testify as to that description. This is entirely proper to show why defendant was stopped. See *People v. Buckner* (1984), 121 Ill. App. 3d 391, 397, 459 N.E.2d 1102.

Eichler's testimony that he stopped defendant around 9 p.m. is relevant to rebut the testimony of defendant's mother that he was home all evening except for a short time between 10 and 10:30 p.m. The alibi was further contradicted by Larson's identification of defendant as his assailant.

■ These similarities tend to establish identity, time and place proximity, possession of a small caliber gun, and intent. Furthermore, the evidence tends to corroborate defendant's confession and to rebut his alibi. Therefore, the evidence is relevant and admissible. However, Officer Horstein's testimony concerning defendant's shooting out streetlights two years prior to the incident in issue should not have been admitted. However, the error is harmless, especially since the information was initially elicited by defense counsel's cross-examination of Horstein and since there is no indication that defendant was prejudiced by the information.

### III

■ Defendant next contends that Larson's out-of-court identification of him at the hospital was suggestive and should have been suppressed and furthermore, Larson's in-court identification should also have been suppressed because it lacked a sufficient independent basis. We disagree with this argument. The United States Supreme Court in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, indicated an appropriate two-step analysis for this issue: (1) Was the out-of-court identification procedure impermissibly suggestive? and if so, (2) Did it create a substantial likelihood of irreparable misidentification? 432 U.S. 98, 107, 53 L. Ed. 2d 140, 149, 97 S. Ct. 2243, 2249.

In the present case, it is clear that the hospital identification was suggestive. One-man showups are not favored but have been justified under certain circumstances, such as situations where a victim's survival is uncertain, where prompt identification is necessary for the police to determine whether a search should continue, or where a suspect was known to the victim before the crime (*People v. Manion* (1977), 67 Ill. 2d 564, 569-70, 367 N.E.2d 1313), as well as other factors not relevant in our case. There is no indication in the record that

any of these circumstances existed here. In fact, at the time defendant was taken to Larson's room, he had already signed a confession. Thus, it is apparent that Larson's out-of-court identification was unnecessary and suggestive. However, such evidence is admissible if, under the totality of the circumstances, the out-of-court identification is reliable enough to negate the likelihood of misidentification. (*Neil v. Biggers* (1972), 409 U.S. 188, 198, 34 L. Ed. 2d 401, 410-11, 93 S. Ct. 375, 382.) Criteria used to determine reliability are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description, the witness' level of certainty at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313.

Larson testified that he first saw the two robbers standing on a well-lit street and that when they entered his cab, the dome light was on. He also saw defendant's face three times as he turned towards the backseat during the robbery. Larson was approximately 2 feet away from defendant's face. These factors are sufficient to meet the first criterion. (See, *e.g., Coleman v. Alabama* (1970), 399 U.S. 1, 4, 26 L. Ed. 2d 387, 394, 90 S. Ct. 1999, 2001 (victim's fleeting look at assailant in headlights of passing car was sufficient).) Larson's attention was focused on the man with a gun pointing at him; this would tend to show that his attention on the robber was more concentrated than would be that of a passerby or casual observer. Furthermore, Larson's initial description was sufficiently accurate—slender white male, approximately 5 feet 10 inches to 6 feet tall, between 16 and 18, with shoulder-length blond hair, and wearing a dark jacket and jeans. Defendant claims that Larson's description was not sufficient since he failed to notice that the robber had crossed eyes as does defendant. However, the court in *United States v. Goodman* (7th Cir. 1986), 797 F.2d 468, 469, held an identification to be reliable although the victim failed to notice that the offender had an eye injury which caused one pupil to appear white. Thus Larson's description of the robber, although not perfect, was close enough to reliably identify defendant as his robber.

■ Defendant also claims that because Larson could not identify defendant from among six photographs the day before the show-up identification, Larson's level of certainty was flawed. However, Larson did not waiver in his identification, either in the hospital or in court, even though defendant appeared in court with shorter hair that was no longer blond. Larson testified that his vision was very poor on

the day of the photograph showing and that he wanted to be certain before making a positive identification. He also stated that his vision had improved by the next day when he identified defendant, five days after he had been shot. This time span was short enough for Larson's memory of the events to remain clear. See *United States v. Goodman* (7th Cir. 1986), 797 F.2d 468, 471 (two months' lapse was permissible when weighed against the victim's certainty).

Accordingly, we find that under a totality of the circumstances, Larson's identification based on a suggestive out-of-court confrontation was sufficiently reliable with no showing of a substantial likelihood of irreparable misidentification and was properly admitted. This is especially true in light of defendant's confession. It is therefore unnecessary to consider the propriety of Larson's in-court identification. Any identification subsequent to a reliable out-of-court identification is admissible. *Manson v. Brathwaite* (1977), 432 U.S. 98, 110 n.10, 53 L. Ed. 2d 140, 151 n.10, 97 S. Ct. 2243, 2251 n.10.

## IV

■ Defendant also alleges that the Hawbecker court erred in allowing hearsay evidence concerning the offender's description and identification by Hawbecker. Several officers testified that they broadcasted descriptions of the assailants in both the Hawbecker and Larson shootings and, further, that they recognized the similar descriptions as matching defendant's appearance. The officers received these descriptions from Hawbecker, Larson, and Deborah Jones, a witness after the Larson shooting. The officers did not recite the descriptions while being examined about the radio messages. However, after extensive direct examination of Detective Stachula by defense counsel regarding the Larson and Hawbecker case reports, the State, on cross-examination, asked Stachula if both reports contained a description. Upon receiving an affirmative reply, counsel for the State proceeded to read the description on the reports. Thereafter, over defense objections, Stachula answered "yes" when asked if the descriptions were sent out over the police radio.

Additionally, one of the officers testified that Hawbecker was shown eight photographs and a lineup, both of which included defendant. No testimony was elicited as to whether Hawbecker made an identification.

Defendant also raises the point that this allegedly inadmissible testimony was subsequently improperly used by the State in closing arguments. The State repeated the officers' testimony and thereafter stated, "So we know, ladies and gentlemen, that the description of

both crimes match that of Robert E. Lee and that Robert E. Lee was on the streets in that community." And, in its rebuttal argument, the State said, "I will ask you to keep in mind, ladies and gentlemen, that is evidence from which you can infer identification of this man."

Hearsay is testimony of an out-of-court statement offered to establish the truth of the matter therein and resting for its value on the credibility of the out-of-court asserter. (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223.) In the present case, the single reference to the viewing of the photographs and a lineup by Hawbecker is admissible, as are the officers' statements that a radio description of the assailants was broadcast and that they recognized it as matching defendant's appearance. This type of testimony has been held admissible to explain why the officers later arrested a defendant. (*People v. Jones* (1983), 114 Ill. App. 3d 576, 583, 449 N.E.2d 547.) Furthermore, an officer may properly testify as to investigative procedures, even though the jury could infer an implication of defendant, since the substance of the conversation was not elicited. (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 397, 459 N.E.2d 1102.) Such testimony is not hearsay because it is based on the officers' own personal knowledge and is admissible though the logical inference to be drawn therefrom is that the received information motivated the police to arrest a certain person. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 529, 464 N.E.2d 659.

Thus, since there is no indication as to whether Hawbecker identified his assailant, that testimony is admissible to show investigative procedures. Furthermore, the testimony that the identifications given by Hawbecker, Larson, and Jones were broadcasted over the radio was proper to show why the police acted as they did in later arresting defendant. Therefore, this testimony was properly admitted for the limited purpose of showing why defendant was arrested.

■■ However, the State's reading of the identification descriptions from the case reports on cross-examination of Stachula was highly improper. It is well-settled that the purpose of cross-examination is to introduce matters which explain, modify, or discredit any evidence elicited on direct examination; moreover, the trial court has wide discretion as to the scope and manner of cross-examination, and only a clear abuse of discretion warrants this court's interference. (*People v. Adams* (1982), 111 Ill. App. 3d 658, 664, 444 N.E.2d 534.) However, defendant's constitutional right of confrontation is superior to the court's discretion. *People v. Betts* (1983), 116 Ill. App. 3d 551, 555, 451 N.E.2d 1028.

In the case at bar, defense counsel never referred to the identifi-

cations in the case reports on the direct examination. It is error to permit a witness to testify to another person's out-of-court identification since such information is hearsay when offered to prove the truth of the matter asserted. (*People v. Jackson* (1979), 79 Ill. App. 3d 660, 666, 398 N.E.2d 906.) Testimony of officers acting pursuant to a radio broadcast is admissible; however, recitation of the broadcast description is inadmissible as proof of identification. (*People v. Marquis* (1977), 54 Ill. App. 3d 209, 212, 369 N.E.2d 372.) Accordingly, it was error to permit the State to bring in through cross-examination evidence that was not admissible on direct examination and then to allow that evidence to be used for identification purposes in closing argument.

■■■ The evidence is inadmissible where the sole basis of guilt is the identification about which the witness testified. (*People v. Overton* (1976), 44 Ill. App. 3d 490, 493, 358 N.E.2d 393.) However, it is not reversible error to allow such testimony if it is merely cumulative or is supported by a positive identification and other corroborative circumstances. (*People v. Jackson* (1979), 79 Ill. App. 3d 660, 666, 398 N.E.2d 906.) Whether the error is harmless depends on whether the improper testimony constituted a material factor in the conviction or resulted in substantial prejudice to the defendant so as to warrant reversal. (*People v. Adams* (1982), 111 Ill. App. 3d 658, 666, 444 N.E.2d 534.) In other words, reversible error occurs where the comments were such that, if they had not been made, the jury might have reached a different result. (*People v. Panczko* (1980), 86 Ill. App. 3d 409, 413, 407 N.E.2d 988.) Defendant relied on *People v. Campbell* (1983), 115 Ill. App. 3d 631, 450 N.E.2d 1318, for his contention that similar testimony later misused by the State requires reversal in this case. In *Campbell,* as in our case, testimony containing the substance of out-of-court statements was admitted and, in closing argument, the prosecutor informed the jury that the out-of-court declarant (an accomplice) had identified defendant. The present case is distinguishable from *Campbell* in that the State argued that an inference could be made, which inference could already be logically deduced from the officers' admissible testimony as to why defendant was arrested, whereas in *Campbell* an inadmissible accomplice's identification was stated as fact. Moreover, the evidence in *Campbell* was closely balanced; in the present case defendant had confessed to the crime charged.

■■■ The jury in the present case was aware that defendant had confessed to shooting Hawbecker; the jury was also aware that it was probable that defendant was arrested based on the description given

by the victims. In view of the fact that the identification comments were cumulative to the confession, we believe that the evidence in this case was otherwise strong enough for a conviction. The error is harmless rather than prejudicial and does not compel reversal. See *People v. Hunter* (1984), 124 Ill. App. 3d 516, 530-31, 464 N.E.2d 659; see also *People v. Buckner* (1984), 121 Ill. App. 3d 391, 398, 459 N.E.2d 1102 (denouncing "prosecutorial brinksmanship").

## V

 Defendant's fifth issue on appeal alleges that the State's repeated misconduct denied him a fair trial. It is argued that the State in its cross-examination of Dr. Jack Arbit directed the jury's attention to defendant's failure to testify. Dr. Arbit is a psychologist retained by the defense to examine defendant. In its direct examination of Dr. Arbit, defense counsel elicited responses from the doctor that indicated defendant was "mentally retarded" and, in fact, used this phrase in closing argument to suggest defendant's confessions was involuntary. On cross-examination, the State questioned Dr. Arbit as to whether defendant was able to describe his schooling, family, income, the medication he was taking, whether defendant could live alone, and similar inquiries. The specific objection concerns the following testimony:

"Q. He [Lee] is also able to understand what police officers are, is he not?

A. He knows what police officers are, yes.

Q. And he knows what it is to be charged with a crime?

A. Within the mental defective level of his potential, yes
\*\*\*.

Q. Well, within the range of his mental defective ability he was able to tell you that on June 6, 1984 that he was charged with the offense of murder?

A. He did not use those words, but he did communicate, yes, that was the concept.

Q. He used the words currently accused of murder, is that right?

A. I think he just used the word murder.

Q. As he sits here he would be able to tell us, if he chose, if he shot somebody in the head four days ago, wouldn't he?

A. If you just asked him to say those words I think he could say those words."

The trial court immediately sustained defense counsel's objection to the last question but denied a later request for a mistrial.

The prosecution cannot directly or indirectly comment on the

defendant's failure to take the stand in his own defense. (*People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291.) However, comments must be considered in context (*People v. Diaz* (1984), 123 Ill. App. 3d 239, 243, 462 N.E.2d 770), and where defense counsel's argument invites or provokes a response, the prosecutor's reply may be deemed proper (*People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 368, 497 N.E.2d 1183). Here, the State clearly was trying to rebut the inference resulting from defense counsel's direct examination of Dr. Arbit. The court in *People v. Smith* (1984), 127 Ill. App. 3d 622, 469 N.E.2d 634, considered a similar occurrence. In *Smith,* defense counsel implied that defendant's confession had been wrongfully coerced and that the signed confession given to defendant's interrogators was not defendant's statement. The defense also implied that but for a "condition" that prevented defendant from testifying, more details would have been presented to the court. The *Smith* court ruled that the State's response that defendant did not testify because he was afraid to was proper. (127 Ill. App. 3d 622, 632, 469 N.E.2d 634.) Although the circumstances in the present case are not as extreme as in *Smith,* we believe that the question in issue, taken in context of the line of questioning, was not a material factor in defendant's conviction and does not necessitate reversal. This is especially true since the trial court immediately sustained an objection to the question.

■■■ Defendant next objects to statements in the prosecutor's closing argument. The State said that defendant was a time bomb that went off once and that he had a renewable fuse and could go off again; "he will go off again. He is dangerous and he did these crimes." Defendant claims that it was improper to allude to other crimes that he may have committed or may commit in the future.

It is well established that a prosecutor has a great latitude in making closing argument and absent a clear abuse of discretion, the trial court's determination as to the propriety of the comments made will be followed. (*People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 368, 497 N.E.2d 1183.) Arguments based on facts or the reasonable inferences therefrom are within the scope of proper argument (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746) even if they reflect unfavorably on the accused (*People v. Turner* (1984), 127 Ill. App. 3d 784, 792, 469 N.E.2d 368). It is not improper for the prosecutor to reflect unfavorably on the defendant and to denounce his wickedness, and even to indulge in invective within the limits of propriety, if based on competent and pertinent evidence. *People v. Owens* (1982), 109 Ill. App. 3d 1150, 1157, 441 N.E.2d 908.

After examining the record, this court considers that the reference to defendant as a time bomb with a renewable fuse was a logical inference to be drawn from the evidence. Larson's identification of defendant as his assailant was before the jury, as was defendant's confession. It was entirely proper to argue that defendant is a criminal who should be taken off the streets. (See *People v. Cruz* (1983), 119 Ill. App. 3d 868, 882, 457 N.E.2d 1281.) We do recognize that the State should have rephrased the statement that defendant "did these crimes," in its argument. However, even improper remarks can be considered harmless error if they do not materially contribute to the conviction. (*People v. Lloyd* (1981), 93 Ill. App. 3d 1018, 1025, 418 N.E.2d 131.) We do not find that the remarks, when examined within the context of both closing arguments in their entirety and upon consideration of the competent evidence already before the jury, created such prejudice as to deny defendant a fair trial. See *People v. Vanda* (1982), 111 Ill. App. 3d 551, 570, 444 N.E.2d 609.

The other objections concern prosecutorial remarks during the trial which defendant alleges unfairly prejudiced the jury. A reviewing court will not interfere with the scope of cross-examination, which is within a trial court's discretion, absent a clear showing of abuse that results in manifest prejudice to the defendant. (*People v. Perez* (1983), 113 Ill. App. 3d 143, 148, 446 N.E.2d 1229.) The record indicates extensive direct and cross-examination on the relevant issues so that the jury had sufficient facts to determine what weight to give to the witnesses' answers. After careful examination of the record, we do not consider the remarks prejudicial and note that defense objections to them were sustained by the trial court.

## VI

■ Defendant also alleges that the trial court improperly refused to instruct the jury as to a major theory of defense. The phrase "it is for you to determine whether the defendant made the statement" was deleted from Illinois Pattern Jury Instruction, Criminal, No. 3.06—3.07 (2d ed. 1981) (IPI Criminal 2d No. 3.06—3.07). The instruction permits deletion only when the defendant admits making all the material statements attributed to him.

The basis for defendant's objection rests on his argument that Assistant State's Attorney Epach, rather than defendant, provided the information contained in Lee's confession. Dr. Arbit testified that he believed that defendant had memory gaps which he filled in with "confabulation." In other words, in Dr. Arbit's opinion, defend-

ant was susceptible to ideas suggested to him. It is argued that the confession contained no facts already not known to the police, especially the identity of the Hispanic accomplice in the Larson shooting and the whereabouts of the gun used in the shooting.

However, the police did not know that a .22-caliber silver gun was used or that defendant went out to rob people to get money for drugs. Moreover, there was lengthy testimony from Epach and Detective Stachula concerning the circumstances surrounding the recordation of defendant's confession. Their testimony that defendant could not read or write very well was supported by Dr. Arbit's evaluation of defendant's mental abilities. Both Epach and Stachula testified that defendant agreed to repeat his confession so Epach could write it down. After receiving a response to a question, Epach would then read what he had written back to defendant. When the entire confession was finished, Epach then read it again to defendant, who signed each of the three pages.

Defendant is correct in asserting that a defendant is entitled to have the jury instructed on any state of facts which, if believed by the jury, would support his theory of defense. (*People v. Arnold* (1977), 48 Ill. App. 3d 250, 252, 362 N.E.2d 461.) It is also true that where a court rules that a confession is voluntary and admits it into evidence, a defendant still has a right to present evidence affecting the credibility and weight to be given to the confession. (*People v. Cook* (1965), 33 Ill. 2d 363, 369-70, 211 N.E.2d 374.) The court in *People v. Fleming* (1981), 103 Ill. App. 3d 194, 431 N.E.2d 16, distinguished cases involving the same instruction deletion as in our case. The *Fleming* court held that the deleted portion need not be given where a defendant offers no testimony to contradict that of the officers; to hold otherwise would only confuse the jury.

In the present case, there was no evidence showing that defendant denied making the confession. Dr. Arbit's testimony would only go to the weight or credibility to be given to defendant's confession—not whether he made it. Moreover, the jury was apprised of its duty to weigh the evidence by the instruction as given, which in part stated that, "In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." (IPI Criminal 2d No. 3.06—3.07.) Additionally, Illinois Pattern Jury Instruction, Criminal, No. 1.02 (2d ed. 1981), which concerns the weighing of testimony and witness credibility, was given. Accordingly, we conclude that, since no evidence that defendant denied making the confession was presented to the jury, the instruction was adequate without the deleted phrase.

## VII

■■■ In his seventh claim of error, defendant asserts that he was denied a fair trial by the improper limitation of his cross-examination of witnesses. Defendant's objections relate to Larson's state of mind on the day of his hospital identification of defendant, whether defendant's apology to Larson was at Detective Stachula's request, and questions pertaining to Epach's obtaining the confession. The State argues that the trial court properly sustained State objections because the questions were either irrelevant, not proper impeachment, or that defense counsel was arguing with the witness.

Regardless of whether the rulings were correct or in error, a trial court's restriction of the scope of cross-examination rises to the level of reversible error only if a defendant manifestly suffered prejudice as a result thereof. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 29, 452 N.E.2d 857.) The extensive record indicates substantial examination of the many witnesses. After careful consideration of the direct and cross-examination of the witnesses, we cannot find that defendant was substantially prejudiced by the trial court's rulings.

## VIII

■■■ Defendant next contends that the evidence was insufficient to support the guilty verdict for attempted armed robbery. Defendant's natural-life sentence was based on the aggravating factor that Hawbecker was shot during the commission of another felony, attempted armed robbery. But for that finding, defendant's sentence for the murder conviction could not have exceeded 40 years. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1).) Defendant argues that the only basis for this charge was his confession statement that "I told him [Hawbecker] to be quiet and give me all his money." He asserts that no other evidence was presented to support the finding that armed robbery was attempted.

This argument is based on the rule that the *corpus delicti* cannot be proved by the defendant's confession alone; there must be some independent or corroborating evidence indicating that the crime occurred. (*People v. Lambert* (1984), 104 Ill. 2d 375, 378-79, 472 N.E.2d 427.) Proof of *corpus delicti* requires both proof of injury or loss, as well as proof of criminal agency. (*People v. Dalton* (1982), 91 Ill. 2d 22, 29, 434 N.E.2d 1127.) The State argues that there is corroborating evidence in that Hawbecker was shot by a small gun on Lakewood by a stranger at approximately 7 p.m. This corroborates defendant's confession as to the shooting of Hawbecker; it does

nothing to corroborate an armed-robbery attempt. Even Hawbecker's statements in the emergency room only indicated that he had been assaulted, beaten, and shot—no mention of an attempted robbery was made. We also note that defendant confessed to an attempted robbery of Paula Tomas; yet, Tomas testified that no one attempted to rob her. Under these circumstances, and in view of the lack of any evidence other than the confession that Hawbecker was the victim of an attempted armed robbery, we must reverse this portion of defendant's conviction.

## IX

●18 Defendant's final argument asserts that his right to a fair and impartial jury was denied when potential jurors were excused when they stated that they could not consider giving the death penalty and by failing to ask potential jurors whether they could consider not giving the death penalty. Defendant argues that a death-qualifying jury is not representative of a fair cross-section of the community. One of the cases relied on by defendant, *Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226, which held that reliable data exist which can be used to determine whether the exclusion of such jurors results in an unrepresentative jury, has been reversed by the United States Supreme Court in *Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758. Furthermore, the Illinois Supreme Court has consistently rejected such reasoning. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Albanese* (1984), 102 Ill. 2d 54, 464 N.E.2d 206; *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Therefore, defendant's argument that the Hawbecker jury was conviction-prone or did not represent a fair cross-section of the community is without merit.

Accordingly, for the foregoing reasons, we affirm defendant's conviction for the murder of Hawbecker but reverse the conviction for attempted armed robbery in the same cause and remand the cause for resentencing (No. 85—754). We additionally affirm defendant's conviction for the attempted murder and armed robbery of Larson (85—3224).

No. 85—754—Affirmed in part and reversed in part and remanded.
No. 85—3224—Affirmed.

SULLIVAN, P.J., and PINCHAM, J., concur.