THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER HOOD, Defendant-Appellant.

First District (3rd Division)   No. 1—89—2841

Opinion filed March 31, 1993.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant, Roger Hood, was convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)) and armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)). He was sentenced to 32 years' imprisonment. On appeal, defendant asserts that he was denied a fair trial because (1) the trial court barred his mother as a defense witness; (2) the trial court refused to publish a properly authenticated photo of his brother; (3) the trial court deleted a phrase of the Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (2d ed. 1987) (hereinafter cited as IPI Criminal 2d); and (4) the State committed prosecutorial misconduct during closing argument. We affirm.

At 7:15 a.m. on March 20, 1987, Henry Pykalo was shot and killed during an armed robbery outside the Rymer meatpacking plant at 4600 South Packers Street, Chicago. Margarita Martinez, who worked with the victim at the Rymer plant, testified that she was walking to work when she saw the victim drive by her and park his car. According to Ms. Martinez, an African-American man was in the victim's car's back seat and there were no other cars in the area. The man, who was holding a small, silver-colored gun, was standing,

blocked the victim's exit, and demanded money. When the victim refused, the man shot him.

Ms. Martinez, who was a street's width away, called out the victim's name as he fell. She stood there watching. The shooter looked through the car's rear window at Ms. Martinez, who ran toward the plant. As she ran, Ms. Martinez turned to see the shooter searching the victim. Ms. Martinez testified that she could not distinguish the man's face or eyes, but that his face was elongated.

When the police arrived, Ms. Martinez described the shooter as a tall, slim, African-American man, six feet or six feet one inch tall, about 26 years old, wearing a dark jacket and a small hat. At trial, Ms. Martinez was shown a 1982 photograph of defendant, but did not recognize the man in the picture. When asked whether defendant, who was sitting at the defense table, was the man who shot the victim, Ms. Martinez asked to see defendant's back and right profile. Then, she replied, "I would say yes," and that he looked like the shooter she saw.

Ms. Martinez stated that she had known the victim for three years, worked the same shift as he did, thought he was a hard worker, knew he carried large amounts of cash in his wallet, and knew that for eight months before his death, he had cashed checks for Rymer employees and sold clothing and candy on the side.

Three days later, Chicago police detective Janette McCarthy spoke with Ronald Hood, who is defendant's brother, at the Rymer plant. On May 22, 1987, she spoke with him at the police station. After that conversation, McCarthy and her partner, Detective Kukulka, went to defendant's mother's house, where they found defendant, who voluntarily came to the police station.

McCarthy testified that defendant denied knowing anything about the murder until the detectives told him they did not believe him. Defendant then stated that he went to the Rymer plant on the morning of March 20, 1987, knowing that the victim carried large amounts of cash on payday. He also knew where the victim parked his car. When the victim drove up, defendant approached his car and demanded money. Defendant then pulled out his gun and the victim was shot. After searching the victim for his wallet, which contained $900 to $1,000, defendant boarded a bus and went to his mother's house.

Defendant then agreed to give a court-reported statement. McCarthy testified that there were inconsistencies in defendant's statements, including whether he shot the victim or the gun discharged while it was in his pocket.

Detective Kukulka testified that he questioned defendant at the police station. During the first interview, defendant denied any knowledge of the murder. According to Kukulka, defendant was not confronted with any discrepancies at that time. Two and one-half hours later, Kukulka told defendant that there were discrepancies between his statements and information the detectives had. Kukulka's account of defendant's subsequent oral statements was essentially the same as McCarthy's account.

Defendant's court-reported statement was read to the jury. According to that statement, defendant was at the scene to rob the victim. When defendant asked the victim for money and the victim refused, defendant pulled a .25-caliber automatic from his right jacket pocket and shot the victim in the arm. When the victim fainted, defendant searched his body. After defendant found the wallet in the victim's coat pocket, he ran from the scene and took a bus to his mother's house. Later, he told his brother that he robbed and shot a dude. Defendant further stated that he bought clothes with the $900 he found in the victim's wallet.

Dr. Eupel Choi, who performed the autopsy, testified that the gunshot wound to the left upper arm was a contact wound. The bullet entered the body at a 45-degree downward angle and lodged in the victim's chest. In Dr. Choi's opinion, the cause of death was a gunshot wound to the left arm.

There was a stipulation that a .25-caliber bullet was removed from the victim and that the spent casing found at the scene was a .25-caliber shell. It was also stipulated that numerous fingerprints were taken from the victim's automobile, but none of them matched those of defendant.

Prior to the defense case, the State moved *in limine* to bar defendant from calling his mother as a defense witness. The trial court granted the State's motion after finding that defendant's mother's testimony would be irrelevant, cumulative, and would not provide defendant with an alibi.

In his own behalf, defendant testified that he was living with his half-brother, Ronald Taylor, and Ronald's girl friend, Mary Griffin, at 629 E. Bowen Street, Chicago, during March 1987. (Ronald Taylor is not Ronald Hood.) At that time, defendant was receiving unemployment compensation after being laid off from Church's Chicken. Defendant had worked nights at Rymer for three weeks in 1983 and knew the victim.

Defendant denied shooting the victim or going to the Rymer plant to rob him. In addition, defendant stated that his custodial statement

was not truthful. Defendant testified that he awoke at noon when he lived on Bowen Street, never at 6 or 7 a.m. Although defendant voluntarily went to the police station on May 22, 1987, to answer questions, he denied any knowledge of the murder. According to defendant, Detective Kukulka told him that he was going to get the death penalty and threatened to arrest his whole family, including his mother, if he did not go along with Kukulka's story.

Defendant testified that he went along with the detective's story because he was scared. Defendant acknowledged that no one hit him, but stated that he was not allowed to call his mother to get help.

Detective Kukulka denied making any of those remarks and stated that defendant never asked to make a phone call.

Ronald Taylor and Mary Griffin both testified that defendant lived with them at 629 Bowen Street, Chicago, during March 1987. Although neither witness could specifically remember March 20, 1987, they both testified that defendant usually got up at 11 a.m. or noon, and never before 7 a.m.

Jeanne Sidemore, the Rymer Foods payroll clerk, testified that the victim worked at Rymer from September 1981 until his death and defendant worked at Rymer for three weeks in April 1983. Ronald Hood worked at Rymer from September 1982 until June 1987, but did not work on March 20, 1987, because he was on vacation.

When defense counsel attempted to introduce exhibit 7, which was a front and side profile photograph of Ronald Hood, the trial court refused to allow the photograph into evidence on the basis that it was cumulative and clearly identifiable as a police mug shot. Instead, a family photograph that included Ronald Hood was admitted into evidence.

At the instructions conference, defendant objected to the State's version of IPI Criminal 2d No. 3.06—3.07, which omitted the phrase that the jury was "to determine whether the defendant made the statements." The trial court allowed the State's version, finding that defendant never denied making the statements, but merely explained why he gave them.

After the jury deliberated, it found defendant guilty of murder and armed robbery. Defendant was sentenced to 32 years' imprisonment for murder and 30 years' imprisonment for armed robbery, to run concurrently.

■ On appeal, defendant asserts that the trial court erred when it barred him from calling his mother as a witness. Defendant argues that barring his mother from testifying denied him his right to present a defense, to present witnesses to establish that defense, and

to present relevant evidence since Mrs. Hood's testimony was relevant to show that his confession to the police was false. Although conceding that his mother's testimony was not sufficient to establish an alibi, defendant contends that it had a tendency to show that his confession was false. According to defendant, Mrs. Hood would have testified that defendant did not live with her on the day of the shooting and that he did not go to her house that morning. Defendant stresses that his oral statement to the police indicated that he had taken a bus to 47th and Racine to rob the victim, then took the 47th Street bus "back home to his mother's house" at 556 East 38th Street.

Further, defendant argues that his mother's testimony regarding family members who worked at Rymer's and were known to the police was relevant because the police produced a false statement by threatening family members, one of whom was a Rymer employee who was at the police station. Defendant concludes that the use of the motion *in limine* to choke off his mother's admissible testimony was a manifest abuse of discretion and requires reversal. We disagree.

The State moved *in limine* to bar defendant from calling his mother as a witness on the basis she had no knowledge of defendant's whereabouts on March 20, 1987. The State argued that she could not provide a credible alibi and the sole reason to call her as a witness would be to gain sympathy. In an offer of proof, defense counsel argued that Mrs. Hood would testify that defendant was not living with her on March 20, 1987, and that she did not see him that day. She also would testify about family members who worked at the Rymer plant.

After the defense counsel represented to the court that defendant would testify, the trial court granted the State's motion, finding that Mrs. Hood's testimony would be cumulative and irrelevant because she could not provide an alibi. Moreover, the court stated, its function would be to gain sympathy before the jury.

A motion *in limine* permits a party to obtain an order before trial excluding inadmissible evidence. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 549.) If the rules of evidence do not require exclusion of the disputed testimony, the trial court must deny the motion. (*People v. Escobar* (1988), 168 Ill. App. 3d 30, 43.) Use of a motion *in limine* should be exceptional, rather than general, and the burden is on the party seeking to bar the evidence to show why it is inadmissible and prejudicial. *Bradley v. Caterpillar Tractor Co.* (1979), 75 Ill. App. 3d 890, 900.

The trial court erred when it excluded defendant's mother's testimony. By keeping Mrs. Hood from testifying, the trial court pre-

vented defendant from fully presenting his defense. Which witnesses to present at trial is a matter of defense strategy. Defendant has a right to call his mother as a witness even if he later testifies to substantially the same facts as long as her testimony is competent, material, and significantly more probative than the same evidence later elicited from him. Where the admitted evidence is not substantially the same, is not as broad and comprehensive, or does not have the same probative force as the excluded evidence, it is error to reject competent and material evidence. *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 61.

Nevertheless, we affirm defendant's convictions because we find that the error was harmless beyond a reasonable doubt. When a trial error affects a Federal constitutional right, it is reversible unless it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827.) To be harmless error, there must be no reasonable possibility that the trial's outcome would have been different if the excluded testimony had been admitted. (*Fahy v. Connecticut* (1963), 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 173, 84 S. Ct. 229, 230.) In determining whether the error was harmless, the sufficiency of the evidence proving guilt beyond a reasonable doubt is considered. *People v. Perez* (1991), 209 Ill. App. 3d 457, 471.

In reviewing all the evidence, we conclude that this error is harmless. There is no reasonable probability that Mrs. Hood's testimony would have altered the trial's outcome. Whether defendant returned to his mother's house on the morning of the shooting is not important to the issue of guilt. Furthermore, Mrs. Hood's testimony that defendant did not live with her would have been cumulative. Beside defendant, two other witnesses, Ronald Taylor and Mary Griffin, testified that defendant lived with them, not his mother, on the day of the shooting. More importantly, Mrs. Hood would have testified that she had no personal knowledge of defendant's whereabouts on the morning of March 20, 1987. The admitted evidence was substantially the same, as comprehensive, and had the same probative force as the excluded evidence.

Similarly, Mrs. Hood's proposed testimony regarding family members who worked at Rymer's would not have affected the trial's outcome. After considering the totality of the evidence presented, we conclude that a trial without this error would produce no different result. *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29.

■ Next, defendant asserts that he was denied the right to present a defense when the trial court refused to publish a properly

authenticated photograph of his brother, Ronald Hood, on the basis that it was cumulative and clearly identifiable as a police mug shot. Defendant maintains that the excluded photograph is important to rebut the State's insinuation that Ronald Hood had named defendant as the offender.

In its closing argument, the State commented:

"[Detective Kukulka] talked to the defendant's brother Ronald Hood on two occasions. On the second occasion after he finished talking to him right away he went and started looking for Roger Hood and found Roger Hood and brought him in for questioning and Roger Hood confessed. Then and only then was he placed under arrest.

When you get to this statement and you take it back to the juryroom take a look at it because in the statement he's asked, if he told his brother Ronald Hood what he did.

And his answer was 'I told him I had robbed the dude, and I had shot him.'

Now you know why the police had Ronald Hood because Ronald Hood told the police *** [w]hat his brother Roger had told him. *** That's why Ronald Hood isn't here because two years later he's in hiding because he doesn't want to come in and testify against his brother."

Defendant contends that Ronald Hood was the shooter and had shifted the blame to defendant. Thus, defendant argues, the excluded photograph, which shows Ronald from the front and profile, was probative of the fact that Ronald and Roger had similar profiles and could have been mistaken for one another by a witness viewing them from a distance of more than 50 feet. The photograph that was admitted into evidence was a family photograph that showed only Ronald Hood's frontal view above the waist.

Furthermore, defendant maintains, the State's heavy reliance on the six-inch height discrepancy between defendant and Ronald Hood is unimportant because height and weight discrepancies are common even in reliable identifications. (*People v. Slim* (1989), 127 Ill. 2d 302, 312.) More importantly, defendant argues, the eyewitness could not positively identify defendant as the offender. After asking to see defendant's back and profile, Ms. Martinez said that he looked like the man she saw.

Finally, defendant contends that the police identification number did not make the photograph inadmissible because Ronald could not have been prejudiced by it. To support his contention, defendant relies on *People v. Smith* (1982), 105 Ill. App. 3d 84, 90-92, where the court

ruled that the defendant should have been able to cross-examine the State's chief witness about his prior convictions because it was a credibility issue and could not be prejudicial to him.

We hold that the trial court did not abuse its discretion in excluding the second photograph. Although the photograph of Ronald Hood's profile could have been helpful to the issue of identification, the admission of one photograph of Ronald was sufficient to show the jury the similarities and dissimilarities between the brothers.

■ Next, defendant asserts that the trial court denied him a fair trial by deleting the phrase of IPI Criminal 2d No. 3.06—3.07 that directed the jury to determine whether defendant made the custodial statements attributed to him at trial. We disagree.

The jury was instructed:

> "You have before you evidence that the defendant made a statement relating to the offense charged in the indictment.
>
> It is for you to determine what weight should be given to this statement. In determining the weight to be given to a statement you should consider all the circumstances under which it was made."

Where a defendant denies making a statement, he is entitled to an instruction which informs the jury that it may determine whether defendant made any statement at all. (*People v. Cook* (1965), 33 Ill. 2d 363, 369-70; IPI Criminal 2d No. 3.06—3.07, Committee Note, at 20.) If, however, the defendant does not deny making the statement and the jury is apprised of the circumstances under which it was made, there is no error in instructing the jury with the deletion. *People v. Lee* (1986), 151 Ill. App. 3d 510, 530.

The trial court did not err in making the deletion because defendant did not deny making the statements. Defendant admitted that he made the statements, but contended that the incriminating words did not originate with him. He stated that he was only telling the story that Detective Kukulka told to him. He also testified that he continued to tell the same story to Detective McCarthy, Assistant State's Attorney De Grazia, and the court reporter. Defendant's testimony about the circumstances surrounding his statements goes to the weight and credibility to be given to the confession. The jury was properly instructed that it should determine the weight to be given to defendant's statements.

■ Finally, defendant asserts that he was denied a fair trial when the State committed prosecutorial misconduct during its closing argument by making improper comments about the fingerprint evidence,

commenting on Ronald Hood's role in the investigation, and appealing to the jury's passion and prejudice.

Defendant waived these arguments because he did not raise them in his post-trial motions. Failure to object to closing remarks at trial and not including the issue in the post-trial motion generally constitutes waiver of the issue. (*People v. Threadgill* (1988), 166 Ill. App. 3d 643, 650.) We decline to consider the remarks under the plain error doctrine.

Based on the foregoing, the circuit court judgment is affirmed.

Affirmed.

TULLY, P.J., and RIZZI, J., concur.