THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE ADAMS, Defendant-Appellant.

First District (5th Division) No. 80—2105

Opinion filed December 17, 1982.

Steven Clark and Susan Kaplan, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lester M. Joseph, and Kim R. Kardas, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2) for which the trial court sentenced him to a six-year term. On appeal, defendant contends that: (1) the State's cross-examination of defendant was improper for it was designed to elicit his opinion of the credibility of State's witnesses and suggested that he had a duty to explain their motivation for fabricating testimony; and (2) the cumulative effect of the improper comments made by the State in rebuttal argument deprived defendant of a fair trial. For the reasons that follow we affirm the trial court.

At the outset, lengthy pretrial motion hearings were held during which defendant's motions to suppress physical evidence, statements, and lineup identification, among others, were denied.

STATE'S CASE

At trial, Adrienne Guidry, the complainant, testified that on February 23, 1979, approximately 9 p.m., she was returning home from having a drink with friends after work, walking south in the middle of Essex Avenue near 79th Street in Chicago, when a man ran up from behind her, grabbed her arm, turned her toward him, and, while pointing a sawed-off shotgun at her, demanded her money. Guidry described the person as a black male, approximately 5 feet 9 inches, 155 pounds, wearing a long black coat, small black hat, tinted sunglasses and carrying a bookbag. He told Guidry that he did not want to hurt her, but that he needed the money to get his car out of the repair shop. Although it was evening, the street was brightly lit by streetlights and house lights whose glow was intensified by reflection off the snow, enabling Guidry to get a very good look at the man who robbed her. Furthermore, she had ample time in which to view her assailant because upon first approaching her, the man directed her away

from the middle of the street to the west sidewalk; then, because that location was even better lit, he directed her across the street near some parked cars. Throughout these maneuvers, Guidry had a clear, unobstructed view of her assailant's face. At one point during the robbery, a red shell with a gold end fell out of defendant's shotgun.

After the robbery, Guidry returned home and immediately notified the police to whom she gave a detailed physical description of the man who had robbed her. Thereafter, on February 27, 1979, after having apprehended defendant, who closely resembled the description given by Guidry, police detectives picked up Guidry from her home and brought her to the police station to view a lineup at which Guidry identified defendant as the man who had robbed her. At trial, Guidry again identified defendant as her assailant and also identified the shotgun and shells that had been recovered from defendant's apartment as those used by defendant during the robbery.

During cross-examination, the defense attempted to discredit Guidry's identification of defendant by focusing on her inability to describe the hat defendant was wearing at the time of the robbery. Because Guidry described the hat at various times as a "tam, turban or skull cap," the defense characterized her identification as unreliable. In fact, Guidry was simply stating the various names commonly used to describe a small black cap such as the one defendant wore during the robbery.

Thereafter, Officer Raymond Madigan testified that on February 27, 1979, approximately 3 p.m., he arrested defendant in the area of 79th and Paxton in Chicago. At the time of his arrest, defendant was wearing a full-length black coat. At the station, Madigan read defendant his rights, informed him that he was under investigation for some armed robberies in the area, and that he would be placed in a lineup to be viewed by several of the robbery victims. Defendant was then taken to the lock-up. Approximately an hour later, Madigan received a call from the lockup keeper, informing him that defendant wanted to talk to him. As a result, Madigan brought defendant back to the tactical office for their second conversation during which Madigan confirmed that the lineups would take place. Defendant then asked him what he wanted to know. In response, Madigan went through several armed robbery case reports and asked defendant if he knew anything about them. Defendant admitted that he knew something about the robbery that took place on February 23, 1979, around 8000 South Essex, and asked Madigan if the victim in that robbery had been a woman, and if she would be at the lineup. When Madigan answered both of defendant's questions in the affirmative, defendant voluntarily

confessed to the robbery, stating that he had been armed with a sawed-off shotgun and had needed money to get his car out of the repair shop. No written statement was taken.

In addition, Officer Donald Mitchell testified that he was one of the officers who arrested defendant on February 27, 1979. Mitchell further stated that he also apprehended Darryl Edmonds, a companion of defendant's, at the arrest scene. Edmonds informed Mitchell that he, another man (Renardo Ross), and defendant had just left defendant's apartment where defendant had been talking about armed robberies and showed them a sawed-off shotgun which defendant kept hidden behind the back panel of a nonworking console television set in the living room of his apartment. While Madigan and several other officers took defendant and Edmonds to the police station, Mitchell and three other officers went to defendant's apartment to recover the shotgun. Mildred Adams, defendant's mother, voluntarily permitted the officers to enter the apartment and to recover the gun.[1] In addition to the gun, Mitchell recovered a holster and two red bullets with gold ends from inside the back panel of the television. Mitchell marked the shotgun for identification and inventoried all recovered items at the police station. On cross-examination, Mitchell stated that the shotgun was operable on the date it was taken into custody. The record reveals that there was some dispute over the operability of the gun as the result of a police crime lab determination that the gun was not operable when examined by a lab technician. However, no actual police crime lab report had been written. To apprise the jury of the conflicting evidence, the parties stipulated to the lab finding and read the following to the jury:

"*** [W]ere Mr. Gainer to be called on behalf of the defendant as a witness, *** he would testify that he is a technician of the Chicago Police Crime Laboratory and that he would state that

---

[1]At the pretrial hearing on defendant's motion to suppress evidence, Mildred Adams testified that she did not answer the door when Mitchell and the others arrived to search for the shotgun. Rather, Mrs. Adams stated that she was in the bathroom at the time and a friend of hers answered the door. The officers allegedly explained why they were there, and when the friend left to tell Mrs. Adams, the officers entered the apartment and found the gun. Mrs. Adams further stated that when she came out of the bathroom, the officers were going down the hallway stairs. In contradiction, Officer John Peoples, one of the officers who accompanied Officer Mitchell to the apartment, testified that it was Mrs. Adams who came to the door and voluntarily let them enter the apartment to recover the gun. On cross-examination, Officer Peoples stated that he was certain it was Mrs. Adams who answered the door because he had seen her at the police station several times prior to that date and had been told then who she was.

he examined the weapon in this case, which had been marked People's Exhibit Number 3, a few days after the date of the arrest, February 27, 1979, and that as a technician for the crime lab, he was unable to fire that weapon."

Thereafter, the defendant's motion to bar the testimony of Assistant State's Attorney William Buenger was denied and Buenger testified that on February 27, 1979, approximately 9 p.m., after the line-up identification had been made, he was called to the Fourth District police station to meet with Adrienne Guidry and defendant, separately. Officers William Zaremba and Mark Morrow were present during Buenger's conversation with defendant. Buenger advised defendant of his rights, asked him about the robbery of Adrienne Guidry, and informed him that a sawed-off shotgun had been recovered from his apartment. At that point, defendant acknowledged that the shotgun was his, although he was not actually shown the gun that had been recovered. No written statement was taken. Subsequently, the State rested its case and defendant moved for a directed verdict which the court denied.

DEFENDANT'S CASE

Kathy Williams appeared for the defense as an alibi witness and testified that on February 23, 1979, the night of the robbery, approximately 6 p.m., defendant telephoned her and asked her to pick him up that evening. Williams met defendant approximately 8:30 p.m. in the vicinity of 79th Street and Yates, walking down the street, and they drove to her parents' house in Markham where defendant stayed until the following evening. Williams stated that at that time she and defendant had been dating each other regularly for about a year. At the time of the trial, however, they were just friends and she had not seen defendant since February 24, 1979, when she brought defendant home from her parents' home. She had been subpoenaed to testify.

On cross-examination, Williams indicated that she first heard about defendant's arrest a few weeks after it had happened (March 1979) and was asked to testify a few months before trial (March 1980). Williams further stated that when she picked up defendant on the evening of February 23, 1979, he was wearing a three-quarter-length rust plaid coat and Totes rubber boots. She had never seen him in a long black coat or a small black hat, but had seen him in tinted sunglasses.

Next, defendant testified that on February 23, 1979, Kathy Williams picked him up on 79th Street and they drove to her parents' house in Markham where he stayed until the next afternoon. Defend-

ant further stated that on February 27, 1979, he was arrested and taken to the Fourth District police station. At the station, he saw Officer Madigan and asked him why he was arrested and also informed him that he wanted to talk to his lawyer. Madigan told defendant that he was under investigation for armed robbery. After being sent to the lockup, defendant asked to talk to Madigan again to find out what the charges were and the amount of his bond. During this second conversation, Madigan asked him about the robbery at 80th and Essex and told him there would be a lineup. Again, defendant asked to speak to his attorney. Approximately 9 p.m. that evening, defendant met with Assistant State's Attorney William Buenger and two police officers at which time defendant again asked to speak to his attorney. During his conversation with Buenger, defendant denied knowing anything about the Adrienne Guidry armed robbery and denied owning a shotgun.

At trial, defendant indicated that the shotgun could have been placed in his apartment by either Darryl Edmonds or Renardo Ross who were in his apartment the afternoon of his arrest. Furthermore, defendant stated that for about four months prior to his arrest, his cousin, Robert Hicks, who had just been released from the penitentiary for a robbery conviction, had lived at defendant's apartment. Shortly before Hicks left, he and defendant had an argument over a woman, at which time Hicks threatened to get back at defendant. Defendant suggested that the shotgun could have been left in the apartment by Hicks.

On cross-examination, defendant admitted that his car was in the repair shop on February 23, 1979. He further admitted that he owned a long black coat and tinted sunglasses, but denied wearing a hat on the day of the arrest. In fact, defendant stated that the police gave him the hat he wore in the lineup. In rebuttal, Officer Madigan testified that at the time of defendant's arrest, he found a small black hat and a pair of tinted sunglasses in defendant's coat pocket.

At the conclusion of testimony, defendant's motion for a directed verdict was denied. Thereafter, closing arguments ensued, after which the jury reached its verdict and a date was set for post-trial motions and sentencing.

Subsequently, during the hearing for post-trial motions and sentencing, defendant's motion for arrest of judgment or, in the alternative, new trial was denied and defendant was sentenced to a six-year term. Defendant then moved for 30 days to amend or supplement his post-trial motion on the ground that the police crime lab firearm worksheet had just been received. The motion was granted. The record, however, indicates that defendant did not file an amended mo-

tion. Defendant's timely appeal followed.

OPINION

Defendant first argues that the State's cross-examination of him was improper because it was designed to elicit his opinion of the credibility of the State's witnesses and suggested that he had a duty to explain the motivation of State's witnesses for fabricating testimony. The State maintains that the questions merely asked defendant to explain his theory of the case, the same theory defendant advanced throughout his examination of the witnesses.

It is axiomatic that the purpose of cross-examination is to introduce matters which explain, modify or discredit any of the evidence introduced on direct examination. Moreover, the trial court is vested with wide discretion in the manner and scope of cross-examination, and only a clear abuse of discretion will warrant this court's interference. (*People v. Buchanan* (1981), 98 Ill. App. 3d 193, 199, 423 N.E.2d 1333.) However, it is equally well-established that it is improper for a prosecutor, during cross-examination, to ask a defendant's opinion of the veracity of other witnesses. (*People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894.) Such questioning invades the province of the jury by infringing upon their function to determine the credibility of the witnesses. (*People v. Hyche* (1980), 91 Ill. App. 3d 559, 414 N.E.2d 1142.) Even though such questioning is considered improper, in the absence of prejudice to the defendant and where the evidence against the defendant is strong, reversal is not warranted. *People v. Dowd* (1981), 101 Ill. App. 3d 830, 844, 428 N.E.2d 894.

The particular portions of the cross-examination to which defendant objects are the following:

"Q. You heard Adrienne Guidry say the man who robbed her had a black peacoat on, isn't that correct?

MR. FITZPATRICK: I am going to object to him asking the witness questions about testimony of the other witnesses. These are improper cross examination.

THE COURT: It is overruled. He may answer.

A. I heard her testify to that, yes.

Q. Do you own a black peacoat?

A. No. I do not.

* * *

Q. You heard Mr. Buenger testify that you told him the gun was yours. Can you explain why he would say that?

A. I have no idea. I told him that the gun -- I did not own a

gun.

\* \* \*

Q. Mr. Witness, do you recall when Mr. Madigan stated that you had -- after he told you that you were being questioned about a robbery in the 8000 block of Essex, you asked him if it was a girl that was robbed? Can you explain why he would state that, that you told him that?

A. Being a sworn in police officer, I have no idea why he would use perjury against me like that? [*sic*]

\* \* \*

Q. Mr. Witness, can you explain why Adrienne Guidry would state that you were the young man that turned her around in the street at 80th and Essex on February 23, 1979, when she was face-to-face with you, about three inches away --

MR. FITZPATRICK: I am going to object to that question. It is improper. I ask it be stricken and ask the jury to disregard it.

THE COURT: All right, sustained."[2]

As support for his contention that his line of questioning was prejudicial, defendant relies on *People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746, *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, and *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450. We find these cases factually inapposite and of no persuasive value. In each of the cited cases, the prosecutor specifically asked the defendant whether the State's witnesses had lied. Thus, the questioning went directly to defendant's opinion as to the veracity of the witnesses, an area which lies solely within the province of the trier of fact. In the pending case, because defendant was never asked whether witnesses had lied, he was not forced to judge the truthfulness of the witnesses. (See *People v. Morse* (1975), 33 Ill. App. 3d 384, 342 N.E.2d 307.) Instead, the defendant was asked whether he could offer any reasons why the particular witnesses testified as they did. If any-

---

[2]Objection to the first question in issue was properly overruled. In addition, defendant did not object to the second and third questions regarding the testimony of Buenger and Madigan, a failure which would permit us to consider the issue waived. (*People v. White* (1977), 52 Ill. App. 3d 517, 521, 367 N.E.2d 727.) However, we note that the main purpose of the waiver doctrine is to enable the reviewing court to have the benefit of the trial court's judgment. Thus, when the matter has in some manner been brought to the attention of the trial court as it was here by defendant's objections to the other substantively similar questions, the reviewing court may, in its discretion, consider the issue on its merits. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 500, 364 N.E.2d 511.) Therefore, this opinion will address all of the cross-examination questions in issue.

thing, this gave him the opportunity to resolve testimony discrepancies in his favor. Furthermore, each of the cited cases was reversed on grounds other than improper cross-examination.

■ In response to defendant's contention, the State asserts that its cross-examination questions merely asked the defendant to state the theory of his case. While we would hesitate to characterize the purpose of the cross-examination as such, we do recognize that a defendant who takes the stand in a criminal case and proceeds to contradict testimony of the State's witnesses subjects himself to questions geared toward pointing out these inconsistencies. (*People v. White* (1977), 52 Ill. App. 3d 517, 367 N.E.2d 727.) In the pending case, we do find that the State's questions were improper in that they asked the witness to comment on the mental state of the witnesses, an area about which he could have no factual knowledge. However, when viewed in light of the entire record and argument, we do not find that these questions constituted a material factor in the conviction or resulted in substantial prejudice to the defendant so as to warrant reversal. See *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 431 N.E.2d 1154.

We next consider defendant's contention that various comments of the prosecutor during rebuttal argument deprived him of a fair trial. In particular, defendant complains that (1) the prosecutor mischaracterized the defense theory; (2) the prosecutor used the integrity of the State's Attorney's office to buttress the testimony of one of the prosecution's witnesses; and (3) the prosecutor offered his own version of the evidence as a substitute for competent testimony.

It is well established that a prosecutor has wide latitude during closing arguments and the trial court's determination as to the propriety of the argument will not be overturned on appeal absent a clear abuse of discretion. (*People v. Bodeman* (1982), 105 Ill. App. 3d 39, 43, 433 N.E.2d 1140.) Moreover, it is always proper during final argument for a prosecutor to comment on legitimate inferences which can be deduced from the evidence. (*People v. Gomez* (1980), 80 Ill. App. 3d 708, 714, 399 N.E.2d 1368.) Even where prosecutorial comments are improper, the defendant must show a reasonable possibility that the questionable language, in light of all the evidence, was a material factor in his conviction. *People v. Bodeman* (1982), 105 Ill. App. 3d 39, 43, 433 N.E.2d 1140.

■ In the instant case, defendant asserts that the prosecution's characterization of the defense theory as one of conspiracy was improper and not in response to any argument advanced by defendant. The record reveals, however, that in his closing argument defendant

suggested that (1) Adrienne Guidry's testimony was prompted by her earlier conversations with Madigan and Buenger; (2) because the State needed testimony regarding a black hat worn by defendant, they put Madigan back on the stand during rebuttal; and (3) the shotgun introduced into evidence was not necessarily the shotgun used during the robbery. The impact of these statements was that the police officers, assistant State's Attorney and the victim manipulated the evidence and testimony to insure defendant's conviction. Clearly, the prosecution's "conspiracy" characterization was an invited response to defendant's statements and innuendos and defendant cannot now claim error when the response is made. (*People v. Hovanec* (1979), 76 Ill. App. 3d 401, 425, 394 N.E.2d 1340.) Furthermore, we do not find that the prosecution's characterization amounted to an instruction of law requiring the jury to find a conspiracy, nor did defendant suffer any resulting prejudice that would have served to deny him a fair trial.

Defendant also claims that he was prejudiced by the following remarks made by the State during its rebuttal argument:

> "*** Assistant State's Attorney Buenger, a licensed attorney, is going to get on the witness stand and tell you a lie, tell you that he never talked to the defendant or—strike that—tell you that he talked to the defendant and he is going to lie to you about the fact the defendant admitted he had a gun?
>
> Why would an attorney do that? Because it is job, because he is employed by the Cook County State's Attorney's Office and he is going to come in and lie for Bernard Carey to get a conviction? That is ludicrous. That is ludicrous."

As support for his argument, defendant relies upon *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217, and *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256. We find these cases clearly distinguishable on the ground that the prosecutor in each case pledged his personal and professional reputation as proof of the integrity and character of the State's witnesses. By contrast, in the case at bar, the witness himself was the State's Attorney whose professional status was brought to the attention of the jury as a proper means to counter defendant's attack on his credibility. *People v. Mayfield* (1979), 72 Ill. App. 3d 669, 678, 390 N.E.2d 1315.

The defendant further argues that, during rebuttal argument, the prosecutor offered his own version of the evidence as a substitute for competent testimony and thereby prejudiced defendant's right to a fair trial. In particular, defendant objects to the following comments made by the prosecutor concerning the shotgun:

"This is not a gunsmith's dream. This gun is a dangerous weapon, yes, but it is not in a perfect condition. And this gun can be fired, ladies and gentlemen. This gun can be fired. This gun can project that projectile. It is a weapon that the crime lab examined and in its normal operating condition of a gun it was unfirable by the admission. But by the man that carried it around and the man who knew it well, it was his private weapon, his tool of his trade, if you will. He could fire that gun.

\* \* \*

This gun has to get from the Fourth District down to 11th and State. It is handled many times by the time it gets down there. You will be able to look at it. It is not a very stable weapon."

In his brief, defendant cites *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5, as support for his position that the aforementioned comments were "neither fair nor reasonable inferences." In *Vasquez*, defendant's conviction for attempted murder of two police officers was reversed and remanded for a new trial on the ground that during closing argument, the prosecutor made several remarks of a highly prejudicial nature. First, the prosecutor suggested that the family of one of the police officers had been harassed. In fact, there was no evidence that the officer's family was subject to harassment and the statement was not a legitimate inference from the evidence presented by the State. In addition, the prosecutor improperly aligned himself with the jury by telling them that he was the 13th juror in the case, thereby suggesting he was impartial.

■ Illinois law clearly states that the prosecutor must confine himself to facts introduced into evidence and to the fair and reasonable deductions and conclusions to be drawn therefrom. (*People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) In the pending case, the shotgun was admitted into evidence; Officer Mitchell testified that at the time it was recovered, the shotgun could be fired; and the parties entered into a stipulation that a technician for the Chicago Police Crime Lab was unable to fire the weapon. Thus, the facts which were the basis for the prosecutor's comments were in evidence. The prosecutor then proceeded to trace the typical route a piece of evidence such as the shotgun would travel once recovered. He never stated that the weapon was altered during that route; rather, he drew the jurors' attention to the condition of the gun and the distance which it must travel to get from the police station to the crime lab. It is our opinion that both parties have a right to comment on the evidence and to draw any legitimate inferences therefrom, even if those inferences may prove detrimental to the defendant. Thus, we find the

prosecutor's comments regarding the shotgun were squarely within the parameters of proper final argument, and no prejudice resulted to defendant.

■ Finally, defendant claims that the prosecutor's comment during closing arguments that "You can't force somebody to give a written statement" misled the jury and distorted the testimony. Defendant's objection, however, comes too late. As stated, this comment was made during closing argument, not rebuttal argument to which objections were properly made. Defendant's counsel never raised any objection to this statement in the trial court. Thus, by remaining silent, defendant failed to provide the trial court with an opportunity to pass on and correct the alleged error. Furthermore, defendant had ample opportunity during his own closing argument to clear up any misconception he thought the jury may have had. He did not, however, take advantage of that opportunity. It is well established that a defendant may not sit idly by and allow alleged irregularities to occur without objection, and afterward seek to reverse his conviction by reason of those same irregularities. (*People v. Taylor* (1974), 25 Ill. App. 3d 396, 323 N.E.2d 388.) Thus, we find defendant has waived his right to raise this objection on appeal.

Accordingly, for the reasons noted, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P.J., and LORENZ, J., concur.