THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIZABETH H. TOLBERT, Defendant-Appellant.

Fifth District   No. 5—98—0170

Opinion filed July 26, 2001.—Rehearing denied August 28, 2001.

KUEHN, J., specially concurring.

Robert Agostinelli and Verlin R. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

Jeff Stunson, State's Attorney, of Elizabethtown (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

The State filed an information in the circuit court of Hardin County on July 29, 1995, charging Elizabeth H. Tolbert (defendant), James M. Sanford, defendant's brother, and Chris Reed, also known as Chris Olveda, with the offense of first-degree murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(1) (West 1994)). The information specifically charged that each of the foregoing people, without lawful justification, shot Wilson D. Tolbert, Jr., knowing said act would cause his death. An amended information was filed on January 17, 1996, charging defendant with first-degree murder for shooting Wilson on May 24, 1995. Additionally, the amended complaint charged defendant with conspiracy to commit first-degree murder. More specifically, it alleged that defendant had agreed with Sanford that a murder should be committed and then furnished Sanford transportation to the scene of the murder in violation of section 8—2(a) of the Code (720 ILCS 5/8—2(a) (West 1994)). We note parenthetically that Sanford was convicted of first-degree murder and conspiracy to commit first-degree murder in 1996. *People v. Sanford*, No. 5—97—0062 (1998) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)). The circuit court severed the three

prosecutions early in the proceedings of this case, and the issues raised herein refer only to defendant's case.

On March 27, 1996, defendant pleaded guilty to a charge of first-degree murder for her involvement in the death of her husband. In exchange for her plea, the State dismissed the accompanying charge of conspiracy to commit first-degree murder and recommended a sentence of 45 years' imprisonment. On May 5, 1997, defendant filed a motion to withdraw her guilty plea. The motion to withdraw was granted subsequent to a hearing. Following a jury trial, defendant was convicted of first-degree murder and conspiracy to commit first-degree murder. The circuit court sentenced defendant to 60 years' imprisonment. Defendant appeals.

●1 Initially, we note that defendant has filed a motion to strike the "facts" section of the State's brief. The State filed an objection and the motion was taken with the case. After reviewing the "facts" section of the State's brief, we note that there are several comments in that section that constitute argument and are, therefore, improper pursuant to Supreme Court Rule 341(e)(6) (177 Ill. 2d R. 341(e)(6)). Even though we are denying defendant's motion to strike the "facts" section of the State's brief, we will ignore the offensive parts of that section and note that they do not enter into our decision in this case.

Defendant initially claims that the circuit court erred when it allowed the introduction of other-crimes evidence, when testimony was given regarding the fraudulent loans secured by defendant far in advance of the offenses charged. Defendant also claims that reversible error occurred because the circuit court failed to give a limiting instruction on other-crimes evidence. Defendant is apparently claiming that the evidence of fraudulent loans was introduced to prejudice the jury against her since it showed evidence of defendant's other criminal acts. Defendant claims that since she was charged with first-degree murder and conspiracy to commit first-degree murder, the other criminal acts had nothing to do with the case at hand. We disagree.

●2 Other-crimes evidence is relevant for *any purpose other* than to show a defendant's propensity to commit a crime. *People v. Luczak*, 306 Ill. App. 3d 319, 324, 714 N.E.2d 995, 999 (1999). This type of evidence is prejudicial because a jury might convict the defendant because it believes that she is a bad person and deserves punishment. *People v. Markiewicz*, 246 Ill. App. 3d 31, 37, 615 N.E.2d 869, 874 (1993). Other-crimes evidence may be relevant and admissible, however, for any other legitimate purpose, such as to prove *modus operandi*, the defendant's state of mind, consciousness of guilt, the absence of an innocent frame of mind or the presence of criminal

intent, the circumstances or context of defendant's arrest, the circumstances of the crime charged that would otherwise be unclear, how an otherwise implausible fact relating to the crime charged arose, the placement of the defendant in proximity to the time and place of the crime, the identification of the weapon used in the crime, whether the crime charged was actually committed, opportunity or preparation, a dislike for or an attitude toward the victim, knowledge, intent, identity, motive, or the absence of mistake or accident (*Luczak*, 306 Ill. App. 3d at 324, 714 N.E.2d at 999; *People v. O'Toole*, 226 Ill. App. 3d 974, 991, 590 N.E.2d 950, 961-62 (1992)), if the probative value outweighs the risk of unfair prejudice. *Markiewicz*, 246 Ill. App. 3d at 38, 615 N.E.2d at 874. This list of purposes " 'should not be taken to mean that these are the only purposes for which evidence of other crimes may be admitted.' " *O'Toole*, 226 Ill. App. 3d at 991, 590 N.E.2d at 962, quoting *People v. Kimbrough*, 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292, 1297 (1985). In fact, the Illinois Supreme Court has stated that evidence of other crimes is admissible if it is relevant to establish any material issue other than the propensity to commit crime. *People v. Stewart*, 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860 (1984). Evidence is relevant if it tends to make the existence of any fact of consequence more or less probable than without the evidence. *People v. Young*, 263 Ill. App. 3d 627, 639, 635 N.E.2d 473, 483 (1994). Although any evidence that tends to show that an accused had a motive for killing the decedent is relevant, to be competent it must at least, to a slight degree, tend to establish the existence of the motive relied on. *Stewart*, 105 Ill. 2d at 56, 473 N.E.2d at 857.

It is within the sound discretion of the circuit court to determine whether the evidence of other crimes is relevant to a material issue and whether the probative value outweighs its prejudicial impact. *Luczak*, 306 Ill. App. 3d at 327, 714 N.E.2d at 1001. The circuit court's ruling as to the admissibility of such evidence will not be reversed absent a clear showing of an abuse of discretion. *People v. Oaks*, 169 Ill. 2d 409, 454, 662 N.E.2d 1328, 1348 (1996). An abuse of discretion occurs when the circuit court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the circuit court. *Markiewicz*, 246 Ill. App. 3d at 38, 615 N.E.2d at 875.

Defendant specifically complains about the testimonies of Norman Graham, branch manager of American General Finance, and Larry Barnard, vice president of Illinois One Bank. Graham testified regarding two separate notes that defendant and her husband had with American General Finance. One loan was made on May 17, 1993. Graham recalled that the loan was applied for by defendant and a

man representing himself to be Wilson. The man carried a driver's license with Wilson's name and a picture of Sanford. The first loan was paid by a renewal, when more funds were added to it and a new note was signed. Defendant provided a verification of income by presenting a signed check from Reed's Market (Olveda's parents' business) that Olveda provided to her. The second note was paid by credit life insurance when Wilson was killed. Graham also agreed that approximately $42,000 in life insurance benefits had been paid to Wilson's two children.

Barnard stated that he had worked for Illinois One Bank, which had been known by various names, for the previous eight years as senior loan officer and vice president. Barnard testified regarding old loans that Wilson had with the bank prior to his marriage to defendant. One of the loans was a note for a mortgage, and his signature had been notarized by a bank employee, Lisa Daughenbaugh, now Lisa Daymon. Barnard also testified regarding the questioned bank documents, which consisted of a consumer credit application, a residential real estate loan application, a promissory note, and a mortgage instrument. All of these documents bear defendant's and Wilson's signatures and were signed in August and September of 1993. Barnard also noted that he had obtained a copy of a driver's license bearing Wilson's name, but not his picture. The driver's license was issued on September 21, 1993.

Additionally, Steven D. Hampton, a forensic scientist with the Illinois State Police, testified that his job is to examine questioned documents. Hampton compared Wilson's known signatures to signatures from the questioned documents. Hampton also reviewed writing samples from defendant and Sanford. Hampton stated that Wilson had not signed the American General Finance documents or the questioned bank documents. Hampton opined that defendant and Sanford had signed the questioned documents.

In the case at bar, the foregoing testimonies were necessary and relevant to establish defendant's motive for wanting Wilson dead. A review of the record shows that defendant and Sanford were drug addicts and that they were desperate for money. The evidence showed that their drug habits were being supported by Wilson's income and the fraudulent loans that defendant and Sanford obtained by forging Wilson's signature. The testimony at the trial showed that approximately 1½ weeks before he was killed, Wilson told defendant that he wanted a divorce. Wilson was upset with defendant because he discovered that he was "flat broke." In fact, Wilson told Jerry Haney, a neighbor, that prior to this time, if he had wanted anything that was $100,000, he could have written a check for it. He told Jerry that his

electricity was about to be turned off and that he had taken the checkbook and the savings account book away from defendant. Wilson claimed that he gave defendant $800 per month to pay the bills. He also stated that he made $1,200 every two weeks. Although defendant called Jerry a few days later to tell him that she and Wilson were back together, she knew that it was only a matter of time before Wilson discovered the fraudulent loans and bounced checks.

Defendant also knew that Wilson was becoming suspicious that she was using drugs. Belinda Hicks testified regarding defendant's use of methamphetamine. Even though Belinda admitted being a drug user herself, she claimed that defendant's drug use scared her. She stated that defendant was paranoid, losing a lot of weight, and acting strangely. Belinda claimed that Wilson realized "the last couple of weeks" before he was murdered that defendant was using drugs. Since Wilson had already asked defendant for a divorce and then he went back to her, defendant knew that it was only a matter of time before he discovered all of the other things that she had been hiding from him. Defendant could infer that if she disclosed all of the information to Wilson or if he discovered it on his own, he would divorce her and her supply of money would end. Moreover, defendant knew that when Wilson discovered that she had forged his name on loan documents, she would, more than likely, face criminal prosecution for fraudulently securing loans in Wilson's name.

A review of the foregoing evidence shows defendant's motive in wanting Wilson dead. The evidence of the fraudulent loans was not offered to show defendant's propensity to commit crimes and, therefore, was relevant and competent.

Defendant claims that the State's evidence showed that she was going to tell Wilson about the fraudulent loans on the day that he was killed. Hence, defendant contends that Wilson's potential discovery of the loans was not a valid theory of motive. We disagree.

The jury was entitled to either believe or disbelieve defendant's testimony that she was going to tell Wilson about the fraudulent loans. If the jury chose to disbelieve defendant's testimony, the State's theory that defendant had a motive to kill Wilson was viable.

Defendant cites the *People v. Harris*, 288 Ill. App. 3d 597, 681 N.E.2d 602 (1997), decision to support her argument that prejudice resulted from the admission of the fraudulent-loans evidence. We note, however, that the relevant portion of the *Harris* decision focused on whether defense counsel was ineffective for failing to request a limiting instruction regarding the introduction of other-crimes evidence and that the court ultimately determined that counsel was not ineffective. The *Harris* court never stated that it is plain error if the court

fails to give a limiting instruction on other-crimes evidence. Hence, the *Harris* decision is distinguishable from the case before this court. Nevertheless, we find some of the remarks by the *Harris* court to be instructive.

•3 Evidence of other crimes carries a risk of unfair prejudice to the defendant, even though it might be relevant for some limited purpose in the case being tried. The danger in the admission of that evidence is that the jury will use the evidence for an improper purpose, such as to conclude that the defendant has a propensity to commit crime. *Harris*, 288 Ill. App. 3d at 605, 681 N.E.2d at 608. We agree with the court's analysis in *Harris*: "Trial judges should recognize the potential peril, whether or not defense counsel first proposes a limiting instruction. The best way to address the problem is to use the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992), taking care that the proper limited purpose of the evidence is used." *Harris*, 288 Ill. App. 3d at 606, 681 N.E.2d at 608. The court went on to note that a circuit court should not only instruct the jury in accordance with Illinois pattern instructions at the close of the case, but the court should also instruct the jury orally from the bench, unless the defendant objects, at the time the evidence is first presented to the jury. *Harris*, 288 Ill. App. 3d at 606, 681 N.E.2d at 608.

We note, however, that it is not always plain error for a court to fail to instruct the jury regarding the limited purpose for other-crimes evidence. *People v. Hooker*, 253 Ill. App. 3d 1075, 1085, 625 N.E.2d 1081, 1090 (1993). "Generally, the only instructions necessary to ensure a fair trial include the elements of the crime charged, the presumption of innocence, and the question of burden of proof." *Hooker*, 253 Ill. App. 3d at 1085, 625 N.E.2d at 1090. Plain error will be found only when the defendant is deprived of a fair trial (*Hooker*, 253 Ill. App. 3d at 1085, 625 N.E.2d at 1090) or when the evidence in a case is closely balanced. *People v. Mullen*, 141 Ill. 2d 394, 401, 566 N.E.2d 222, 226 (1990).

In the instant case, a review of the record shows that defendant's trial included the necessary instructions. Defendant complains, however, that plain error occurred when the circuit court failed to give a limiting instruction to the jury regarding other-crimes evidence, because the evidence was closely balanced. We disagree.

The record shows that defendant was a homemaker whose primary responsibilities included caring for her and Wilson's two young children and managing the family's finances. Sanford was unemployed. Olveda (also Wilson's cousin) worked at a convenience store that her parents owned. The evidence showed that defendant, Sanford, and

Olveda were heavy methamphetamine users. Although defendant sold methamphetamine, she was unable to afford the habit. Olveda testified that she, defendant, and Sanford were addicted to methamphetamine and took it hourly. Olveda stated that each one of them required more methamphetamine each time because their bodies had built up a tolerance for the drug. Olveda stated that in order to keep herself supplied, she sold methamphetamine for defendant.

Wilson did not approve of taking illegal drugs, so defendant kept her methamphetamine use from him. The record shows, however, that approximately two weeks before Wilson's death, he became suspicious that defendant was involved with drugs. Wilson was aware that his electricity was about to be turned off and that he and defendant were having financial problems. Wilson never learned about the fraudulent loans that defendant and Sanford had obtained in his name. Subsequent to a brief separation, defendant and Wilson reconciled. Wilson then denied defendant access to their checking and savings accounts, placed her on an allowance, and set up a separate account for household expenses.

The State used defendant's testimony from Sanford's trial in May of 1996. Defendant's testimony resembled Sanford's testimony. Defendant stated that Wilson was upset when he came home from work on the morning of May 24, 1995. They argued quite a bit about money because they had a lot of bills and were receiving letters on their debts. After arguing with defendant, Wilson left his home to check on his cattle. He was angry. He planned to mow grass after checking the cattle. Sanford arrived at the Tolberts' residence after Wilson left. According to defendant, she told Sanford that she was going to "come clean" with Wilson and tell him about the fraudulent loans. Defendant also told Sanford that there would be no more drugs at her house. In fact, Sanford and Olveda were not allowed at the Tolberts' home because Wilson was very much against using drugs. Defendant claimed that Sanford left her home claiming that he was going to talk with Wilson. According to Sanford, this angered him and he decided on his own that he was going to find Wilson and kill him. Although Sanford acknowledged that he had maintained his innocence at his own trial (even though he was convicted of Wilson's murder) and had written letters to others protesting his innocence, he admitted at defendant's trial that he had shot Wilson in the back with a .22-caliber firearm. Sanford claimed that after the shooting, he retrieved Wilson's gun from his pocket. Sanford claimed that he then stopped at a local dump, where he buried the .22-caliber firearm that he had used to shoot Wilson. The bullet paralyzed Wilson from the waist down.

Defendant testified that in the afternoon, she went to check on

Wilson. We note parenthetically that Sanford claimed that defendant had called him in the early afternoon and asked him to check on Wilson and to call her back. Defendant claimed that as she went to look for Wilson, she passed Olveda's Monte Carlo and eventually discovered that her husband had been shot. Wilson told her that Sanford had shot him. Defendant left Wilson alone. Instead of calling for help, defendant drove back to the place where she saw the Monte Carlo. She found Sanford and Olveda and informed Sanford that Wilson was not dead. Defendant told Sanford that Wilson stated that Sanford had shot him. Sanford replied that Wilson had not seen him. Olveda told defendant to call an ambulance. Olveda stated that defendant and Sanford whispered for quite some time. She could not hear what they were saying. They were both very calm during this conversation. Defendant attempted to get Olveda to go back to the farm with her. Olveda refused. Olveda noticed that defendant had a small silver pistol in her vehicle. Olveda claimed that Sanford and defendant left together and drove toward the Tolberts' farm. Olveda stated that she left in her vehicle and drove in the opposite direction. Olveda stated that after a few minutes, she turned her vehicle around and also drove toward the farm. Olveda passed defendant driving her vehicle and saw Sanford walking on the road. Olveda picked Sanford up. Sanford showed Olveda the small silver pistol that defendant previously had in her vehicle. They drove to Decker Springs, where Sanford hid the murder weapon underneath a rock.

During Sanford's testimony, he admitted that he later shot Wilson between the eyes. Sanford claimed, however, that it was Olveda who drove him to the scene of the crime, rather than defendant. Sanford testified that he and Olveda originally agreed to blame Wilson's murder on defendant, but he later decided that he did not want to see defendant convicted since she had nothing to do with Wilson's murder.

Defendant admitted that after she discovered that Wilson had been shot, she drove past several homes of people that she knew, despite the fact that they were home. Some of these people considered her a friend, and some had allowed her to use their telephones in the past. Defendant eventually stopped at Mack Decker's residence. Defendant claimed that the reason that she stopped at Mack Decker's residence was that he was the only friendly person that she knew that lived on the highway. We note, however, that Decker stated that he did not know defendant. On another occasion, defendant claimed that she went to Decker's home because no one else appeared to be home.

Sanford told Kathy Davis, his and defendant's half-sister, that he "did Junior [Wilson]" and mentioned several details about Wilson's murder. Kathy stated that Sanford implied that he could get rid of her

husband also. Sanford told Kathy that defendant had given him a "big bag of dope" to kill Wilson. Additionally, defendant told Kathy that she and Sanford had "to do" Wilson because he had "turned bad." Kathy heard defendant tell Sanford that he was going to "blow it" and that he had to "kiss [Olveda's] a--."

Tracy Davis, Kathy's husband, overheard defendant telling Sanford that Olveda knew too much and that he was going to have to "suck up" to her. After Sanford left, defendant told Tracy that Sanford could not leave Olveda because she knew too much. Defendant said that she was "going to get rid of [Olveda]" because she "would tell." When Tracy told defendant that Olveda planned to return to Illinois, defendant stated that Olveda would never make it back to Illinois, that she would never let her get to Illinois, that she and her car would disappear, and that "there would be no evidence this time."

Defendant claimed that Kathy wanted to "steal everything" she owned. We note, however, that Kathy inherited $2 million from her adopted parents' estate. The record also shows that Kathy and Tracy Davis had cosigned a loan for defendant subsequent to Wilson's death, and they took a $2,000 loss on the loan.

Defendant, Sanford, and Olveda were arrested in Oklahoma and extradited to Illinois. Subsequent to the arrests, defendant wrote Sanford several letters. One letter said: "James, I promise[,] when I get out you'll get out. I'll need to talk to you about this a lot more. *** For I know I let you down, but you promised to tell them it was you. You didn't, and look where it got us." Another letter stated as follows: "And I'll have the other money to buy you the best lawyer from Chicago *** and prove what a d--k [Wilson] was. Tell it how you want[,] but get me out so I can get my money and help you. *** Just tell them what you want. But make it clear we never talked about it and I know nothing! *** Get busy. [Wilson's sister] is trying to get the boys['] social security and the insurance money!" Olveda also claimed that defendant told her, "I'm sorry for getting you and James into this mess but for right now it would be best for you to take the blame for the murder because [I] *** have enough money to get you a good attorney."

●4 Hence, the evidence in the instant case was not closely balanced. The record shows that defendant and Sanford were drug addicts and desperate for money. Defendant and Sanford knew that it was only a matter of time before Wilson discovered that they had taken out fraudulent loans in his name and that they were taking drugs. The evidence shows that defendant and Wilson were having financial difficulties. The record also shows that Wilson was becoming increasingly suspicious that defendant was taking drugs. Numerous

witnesses testified that the Tolberts were having marital difficulties. Defendant and Sanford knew that when Wilson discovered the drug use and fraudulent loans, he would divorce defendant and they would be prosecuted. Additionally, defendant and Sanford knew that, at that point, their money supply would be terminated. It is clear that when Sanford initially shot Wilson, he was paralyzed. It is equally clear that when defendant "discovered" that her husband had been shot, she left him alone and, instead of calling for help, she found Sanford and told him that Wilson was not dead. She told Sanford that Wilson said that Sanford shot him. Sanford and defendant whispered to one another for quite some time. During this conversation, they were both very calm. Defendant and Sanford left. Sanford then shot Wilson between the eyes and killed him with the gun that Olveda had seen in defendant's vehicle. Defendant called for help after she knew that Wilson was dead. This information, in conjunction with the various witnesses' testimonies at the trial and the letters that defendant had written to Sanford, shows that the evidence in this case was not closely balanced.

●5 Next, defendant claims that the State introduced improper motive evidence that she was a beneficiary of various life insurance policies without establishing, as a requisite foundation, that she knew about the policies and was aware of her status as a beneficiary.

We note, however, that defense counsel failed to raise a timely objection when the testimony regarding the life insurance policies was presented. Additionally, defendant failed to raise this issue in her posttrial motion. In order to preserve an error for review, an objection to the alleged error must be made at the trial and included in a posttrial motion. *Markiewicz*, 246 Ill. App. 3d at 39, 615 N.E.2d at 875.

Defendant urges this court to consider this issue under the plain error rule (134 Ill. 2d R. 615(a)) because, she claims, the evidence was closely balanced. Since we have already determined that the evidence in this case was not closely balanced, we need not review this issue under the plain error rule. Hence, the issue has been waived.

●6 Defendant also claims that her conviction must be reversed and the cause must be remanded because the State erroneously introduced a prior consistent statement of one of its witnesses. Defendant urges this court to find that the prior statement improperly bolstered the credibility of the State's witness and that the alleged error was aggravated by the absence of a limiting instruction.

We note, however, that defense counsel failed to object to the introduction of the prior consistent statement at the trial. Additionally, defendant failed to raise this issue in her posttrial motion. In order to preserve an error for review, an objection to the alleged error

must be made at the trial and included in a posttrial motion. *Markiewicz*, 246 Ill. App. 3d. at 39, 615 N.E.2d at 875.

Defendant again urges this court to consider this issue under the plain error rule because, she claims, the evidence was closely balanced. Since we have already determined that the evidence in this case was not closely balanced, we need not revisit this issue under the plain error rule. Hence, the issue has been waived.

•7 Defendant also claims that the circuit court erred in allowing a State witness, Agnes Wolter, to give lay opinion evidence that defendant was guilty of murdering her husband.

We note, however, that a review of the record shows that it was defense counsel that elicited Wolter's lay opinion evidence that defendant was guilty of murdering her husband. "[A] party who 'opens the door' on a particular subject is barred from objecting to questioning based upon the same subject." *People v. Pursley*, 284 Ill. App. 3d 597, 604, 672 N.E.2d 1249, 1254 (1996). Hence, a defendant cannot complain about a line of inquiry that he has invited. *People v. Hancock*, 83 Ill. App. 3d 700, 703, 404 N.E.2d 914, 916 (1980).

Wolter testified at defendant's trial as a witness for the State. Wolter is defendant's younger sister. When defense counsel crossexamined her, the following colloquy occurred:

"Q. [Defense counsel:] So isn't it true that you have decided that your sister is guilty of murdering her husband?

A. [Wolter:] (No response.)

Q. [Defense counsel:] That's a yes or no answer, ma'am. Yes or no?

A. [Wolter:] Yes."

Defense counsel also asked Wolter if she was at the scene of the crime. She answered "No." Wolter was asked if she saw "anybody shoot anybody." She answered "No." Wolter was also asked if she had reviewed the evidence in this case from a scientific standpoint. She answered, "I am not a scientist." Defense counsel also asked Wolter if she saw any murder weapons. She responded in the negative. Defense counsel then asked the following question: "And you've taken all this hearsay and rumor and you've decided that your sister murdered her husband, right?" Wolter answered that she did not believe that it was hearsay. Defense counsel later asked Wolter to comment on defendant's guilt or innocence, when he asked her the following question: "Did you have any evidence to offer that she [defendant] murdered *** [Wilson] of your own personal knowledge besides rumor and hearsay?" Wolter answered that she had no evidence that defendant had murdered her husband.

A review of the foregoing testimony shows that defense counsel

initially elicited the information that defendant is now complaining about the State obtaining from Wolter. Hence, defendant opened the door to the line of inquiry regarding Wolter's bias toward defendant, and she is now barred from objecting to the State's line of questioning on the same subject.

Additionally, defendant claims that it was reversible error for the circuit court to allow Wolter's opinion, because it was based upon inadmissible hearsay. We disagree.

Hearsay has been defined as an out-of-court statement that is offered to prove the truth of the matter asserted and depends for its value on the credibility of the out-of-court declarant. *People v. Edgecombe*, 317 Ill. App. 3d 615, 627, 739 N.E.2d 914, 924 (2000).

A review of the record shows that when defendant was arrested for Wilson's murder, she called Wolter, who lived in Arizona. Defendant asked Wolter to take her two children and care for them. Wolter did as defendant requested. Wolter spent approximately $9,000 in obtaining legal guardianship of the children and now receives $1,826 per month in social security benefits for the children. In the context of the trial transcript, it is clear that defense counsel attempted to make Wolter appear as if she had a financial motive for wanting to keep defendant's children. Defense counsel also attempted to make Wolter appear as if she had no basis for believing that defendant was guilty of murdering Wilson. Defense counsel wanted the jury to believe that Wolter wanted defendant in prison because Wolter wanted to keep defendant's children because of the social security benefits attached to them. Defense counsel's line of inquiry to Wolter shows that he was attempting to show Wolter's bias against defendant. Defense counsel was also trying to show that Wolter had no basis for her belief that defendant was involved in murdering her husband. On redirect, the State attempted to show that defendant had a basis for her belief, and the State asked Wolter the following question: "You told defense counsel on cross-examination that you believed that your sister, Elizabeth, was guilty of being involved in the murder; is that right?" Wolter answered "Yes." When the State attempted to ask Wolter if her belief that defendant was guilty of murdering her husband was based upon a conversation that Wolter had with her parents, Ray and Virgie Sanford (also defendant's parents), defense counsel objected on the basis of hearsay. The circuit court allowed the State to ask the question, and Wolter answered "Yes." When the State attempted to continue this line of questioning, defense counsel objected again, and the following colloquy occurred:

> "MR. CHRISTENSON [defense counsel]: Hearsay—calls for hearsay. It's not relevant what she thinks about this, and it's clearly a leading question.

MR. ZALAR [special prosecutor]: I merely asked her to direct it towards that area of inquiry, and then I was going to ask. He asked about her belief. It's the basis—part of the basis for her belief."

The circuit court overruled defense counsel's objection but cautioned the State to refrain from eliciting from Wolter any particulars about that conversation. The court agreed with the State that defense counsel had tried to show that Wolter was biased and that the State was merely attempting to rehabilitate the witness and show that she had a basis for her belief that defendant was guilty of murdering her husband. Wolter then testified that her parents lived next door to defendant and Wilson. Wolter stated that she had numerous conversations with her parents, and those conversations formed the basis for her belief that defendant was responsible for Wilson's death. At no time did Wolter testify as to the substance of the conversations with her parents.

Hence, the record shows that Wolter's opinion regarding defendant's guilt was based upon discussions that she had with her parents. This testimony was not elicited to establish that the substance of those conversations was true. Wolter's testimony on this subject merely formed the basis for her opinion that defendant was guilty of murdering her husband. Because the contents of the underlying statements were never disclosed, no hearsay evidence was admitted.

•8 Finally, defendant claims that she was denied a fair trial because the State repeatedly asked her to comment on the veracity of various State witnesses.

The circuit court is vested with wide discretion in the manner and scope of cross-examination, and only a clear abuse of discretion will warrant this court's interference. *People v. Adams*, 111 Ill. App. 3d 658, 664, 444 N.E.2d 534, 539 (1982). We note, however, that it is improper to ask a criminal defendant to opine regarding the truthfulness of other witnesses because such questions invade the jury's function of determining for itself the credibility of the witnesses. While such questioning is improper, the prejudice resulting therefrom must be substantial to mandate a reversal. *People v. Martin*, 271 Ill. App. 3d 346, 356, 648 N.E.2d 992, 1000 (1995). In fact, in the absence of prejudice to the defendant and where the evidence against the defendant is strong, a reversal is not warranted. *Adams*, 111 Ill. App. 3d at 664, 444 N.E.2d at 539.

The particular portions of the cross-examination to which defendant objects are as follows:

"Q. So if *** Mr. Belford testified [that you parked your Blazer in the area indicated on Exhibit 5], he was inaccurate in his testimony?

A. Very inaccurate.

\* \* \*

Q. Are you telling us that Shirley Oxford's testimony was inaccurate?

[Defendant's response was nonresponsive to the question]

\* \* \*

Q. So if Tammy Johnson remembers seeing [defendant's Blazer] there[,] her memory would be inaccurate?

A. There is [sic] quite a few different versions of that.

Q. But Tammy Johnson's memory would be inaccurate if that is what she remembered?

A. Hers and many others, yes.

\* \* \*

Q. [Nancy Fatheree's] testimony was inaccurate about that?

A. Very much so.

\* \* \*

Q. So Mr. Carr would be inaccurate about his testimony in that?

A. He might be, yes.

\* \* \*

Q. So Sandy Potts would be inaccurate in that?

[Defendant's answer was nonresponsive to the question]

Q. So anything that [Belinda Hicks] told the jury about [her marriage] you are saying is not true?

A. Yeah, it's not.

\* \* \*

Q. And is it your memory that [the forensic lab specialist's] testimony would be accurate regarding those documents?

A. Yes."

Defendant claims that the foregoing questions were designed to elicit defendant's comment upon the credibility of the State's witnesses.

Initially, we note that defendant cites, *inter alia, People v. Riley*, 63 Ill. App. 3d 176, 379 N.E.2d 746 (1978), *People v. Graves*, 61 Ill. App. 3d 732, 378 N.E.2d 293 (1978), and *People v. Hicks*, 133 Ill. App. 2d 424, 273 N.E.2d 450 (1971), as support for her contention that the State's line of questioning was prejudicial. These cases, however, are factually inapposite and are of no persuasive value to the instant case. In each of the foregoing cases, the State asked the defendant whether the State's witnesses had lied. The questioning went directly to the defendant's opinion as to the veracity of the witnesses. Hence, the questioning in these cases invaded the province of the trier of fact. In the instant case, the defendant was never asked whether witnesses had lied.

In *People v. Morse*, 33 Ill. App. 3d 384, 391, 342 N.E.2d 307, 312 (1975), a defendant claimed that the circuit court erred in allowing

the State to inquire of the defendant during cross-examination whether statements made by several State witnesses were "wrong" or "mistaken." The *Morse* court found no impropriety in the State's cross-examination of the defendant. The *Morse* court stated that the defendant was not forced to judge the truthfulness of the witnesses. The characterization of a statement as "wrong" or "mistaken" includes the possibility of a mistake on the part of the witness.

Likewise, when the State asked defendant in the case at bar if a statement was "accurate" or "inaccurate," defendant was not asked to judge the truthfulness of the State's witnesses. The words "accurate" and "inaccurate" also connote the possibility of a mistake or error. Hence, we find no error in the State asking defendant if a statement made by one of the State's witnesses was "accurate" or "inaccurate".

Finally, the State acknowledges that it was improper to ask defendant if Hicks' testimony that the two had discussed defendant's marital problems was "not true." See *People v. Dunning*, 88 Ill. App. 3d 706, 711, 410 N.E.2d 1052, 1056 (1980) (asking the defendant whether the State witnesses' testimony was true or untrue is clearly improper). We agree. We note, however, that in light of the strong evidence of defendant's guilt, this question and answer did not constitute a material factor in her conviction or otherwise prejudice her so as to justify disturbing the verdict. *Dunning*, 88 Ill. App. 3d at 711-12, 410 N.E.2d at 1056. While we do not condone this type of questioning, we cannot conclude that this error warrants the granting of a new trial. See *People v. Hopkins*, 107 Ill. App. 3d 422, 426, 437 N.E.2d 722, 726 (1982).

In light of the foregoing analysis, we affirm defendant's convictions. Additionally, we deny defendant's motion to strike the "facts" section of the State's brief.

Affirmed.

WELCH, J., concurs.

JUSTICE KUEHN, specially concurring:

I concur. However, I disagree with our reliance upon an earlier decision of this court that was, in my opinion, wrongly decided. I believe that all of the cross-examination questions that the State employed in order to elicit the defendant's opinion about other testimony were improper and prejudicial. We have never tolerated such questioning of other witnesses and should not allow for it in the case of the criminally accused. Indeed, it appears that many prosecutors engage in such impropriety on a routine basis.

Because of the overwhelming evidence of this defendant's guilt, a reversal is unnecessary. Notwithstanding, we should not countenance the kind of questioning that this defendant was made to endure.

The majority correctly points out that we have drawn a distinction between asking a defendant to opine about the honesty of a witness and asking a question designed to merely elicit an opinion about whether that witness was wrong or mistaken. *People v. Morse*, 33 Ill. App. 3d 384, 391, 342 N.E.2d 307, 313 (1975). Rather than perpetuate a distinction without meaning, I would prefer that we seize this opportunity to dispatch a decidedly poor opinion. No doubt, other defendants will share in the kind of improper ridicule heaped upon this defendant, because of the *Morse* decision. We should expose the ill-conceived nature of the decision instead of perpetuating its myth.

*Morse* completely ignores the reason for prohibiting this form of cross-examination. Instead of focusing upon the real reason behind the rule, Justice Karns found that the only problem in asking for opinions about the truthfulness of other witnesses was one of characterization. According to him, asking for an opinion about another witness's truthfulness would fail to allow for the possibility that the witness could be mistaken. Since this was the only problem that he was able to discern, he could not understand what was wrong with asking a defendant to judge whether other testimony was wrong or mistaken. However, even under his misguided logic, asking a defendant whether a witness was mistaken in the testimony that he gave would be similarly improper. After all, it would fail to allow for the possibility that the witness was lying.

Thus, we held that defendants could be asked their opinions about whether other witnesses were worthy of belief, so long as the question did not specifically inquire into a defendant's opinion on a witness's honesty. Of course, this conclusion was totally mindless of the reason this kind of cross-examination is infirm.

The problem that underlies this kind of inquiry exists whether the question asks for an opinion of another witness's honesty or for an opinion about other testimony's accuracy. The defendant is being asked to judge someone else's testimony and give his opinion that the testimony is unworthy of belief.

This method of cross-examination serves only one purpose—to improperly prejudice the accused with questions designed to elicit irrelevant testimony. A defendant's opinion about whether a witness lied or, for that matter, whether a witness testified inaccurately neither proves nor tends to prove anything. *People v. Hicks*, 133 Ill. App. 2d 424, 434, 273 N.E.2d 450, 458 (1971). Rather, it invades the province of the jury and places the defendant in the impossible position of

being the judge of another witness's worth. *Hicks*, 133 Ill. App. 2d at 434, 273 N.E.2d at 458.

Whether the questions draw opinion on how witnesses testified falsely or draw opinion on how they gave testimony that was simply inaccurate, the questions ask for a defendant to opine that someone else's testimony should not be credited.

We can see from the cross-examination in this case how a line of questioning that asks a defendant to judge the testimony of others can do damage. Basically, the questions ridicule the defendant by having him judge others who testified adversely to him. As each of the State's witnesses gets judged, the defendant's stature as a witness is slowly, and effectively, diminished. And all this is done under the guise of gathering information relevant to the jurors' task. However, the prosecutor is not attempting to elicit relevant evidence. He has no real interest in knowing the defendant's opinions about other testimony. The method is far more argument than legitimate inquiry.

It appears that this methodology is extensively employed by prosecutors afforded the opportunity to cross-examine defendants. We see it used time and time again. On many occasions, just like here, prosecutors cannot resist the use of questions that even Justice Karns would not condone.

I wonder how many fledgling prosecutors have been schooled on this method of ridiculing defendants when they testify—how many have learned the mystery of semantics spawned by this court. I wonder if any of them have deciphered some reason we would find it permissible to ask whether a defendant thought another witness testified accurately but would frown upon asking whether he thought another witness testified truthfully.

I believe that the entire line of questioning that had this defendant judge the testimony of others was improper and unfair. We should overrule *Morse*, recognize this kind of inquiry for what it is, and end the practice of posing questions designed to elicit irrelevant opinions judging the testimony of others.